## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**SHAWN BURKE PHELPS,**

           **Plaintiff**,

**v.**

**STATE OF KANSAS, et. al**,

           **Defendants**.

**Case No. 23-2206-DDC-RES**

## <u>MEMORANDUM AND ORDER</u>

Plaintiff's Fourth Amended Complaint—4AC, for short—tells a story of small-town political corruption.  Plaintiff alleges a variety of local actors conspired to remove him from his city council position, destroy his reputation, and harm his mental health.  Doc. 129 at 2 (4AC ¶ 3).  And, he asserts, the whole conspiracy was "in retaliation for and to silence his complaints about rampant and well-known government abuse, waste, and corruption in" Smith Center, Kansas.  *Id.*  His 4AC asserts 18 causes of action against 13 defendants, many asserted in both their official and individual capacities.  *See generally id.*  Painting with broad brushstrokes, plaintiff alleges a retaliatory conspiracy to besmirch his name involving false accusations, unconstitutional searches, trumped up criminal charges, falsified affidavits, an illegal arrest, and a muddled expungement.  Defendants have filed dismissal motions.[1]  The city and county

---

[1]     Plaintiff has named the following defendants:  Smith County, Kansas Board of County Commissioners; Smith County Sheriff's Department (SCSD); City of Smith Center, Kansas; Tabitha Owen; Bruce Lehman; Chris Bailey; Jeremy Presbrey; Bryce Wiehl; Travis Conaway; and Hope Padilla—whom the court refers to as "the city and county defendants" in this Order.  Doc. 129 at 1–2 (4AC).  Also, he's sued defendants State of Kansas, Adam Zentner, and Cathi Holt, whom the court refers to as "state defendants."

defendants filed one joint Motion to Dismiss (Doc. 136) and the state defendants filed another

Motion to Dismiss (Doc. 138).  For reasons explained below, the court grants both motions and

dismisses all plaintiff's claims.  It starts with the factual background.

## I.      Background

The court "accept[s] as true all well-pleaded factual allegations in the complaint and

view[s] them in the light most favorable to [plaintiff], the non-moving party." *Purgatory*

*Recreation I, LLC v. United States*, 157 F.4th 1173, 1182 (10th Cir. 2025) (quotation cleaned

up).  Plaintiff's 4AC is long; it spans 102 pages and alleges hundreds of facts.  Trying to use the

court's resources efficiently, the court confines its background discussion to a top-level

summary, adding supplemental facts, as necessary, throughout the analysis.

### *A Conspiracy is Born*

Plaintiff alleges a multi-year plot carried out by an ever-expanding band of conspirators.

They allegedly aimed to silence him and retaliate against him for speaking out against Smith

Center corruption.  Doc. 129 at 2–3 (4AC ¶ 3).  The alleged plot started small—with three city

defendants who held prominent roles in Smith Center's governance.  *Id.* at 14 (4AC ¶¶ 71–72).

Those three defendants are Bryce Wiehl (Smith Center's mayor), Hope Padilla (Smith Center's

director of economic development), and Tabitha Owen (Smith Center's attorney and Smith

County's prosecutor).  *Id.* at 3–4 (4AC ¶¶ 10, 15, 16).  Plaintiff alleges that the three began

conspiring to remove him from his city council seat.  *Id.* at 14 (4AC ¶ 72).  Eventually, Owen

roped in county defendant Chris Bailey—a friend of hers—who was the Smith County

undersheriff.  *Id.* at 3, 16 (4AC ¶¶ 12, 81).  The four then began conspiring to charge plaintiff

with crimes, hoping to instigate his removal from office.  *Id.* at 16 (4AC ¶ 81).  The circle of

county conspirators expanded as Owen and Bailey pulled in two newly hired sheriff deputies—

2

including defendant Jeremy Presbrey—to "'take the lead'" on the criminal "'investigation'" and give the investigation "an appearance of legitimacy[.]" *Id.* at 17 (4AC ¶ 85). Plaintiff then alleges that these six conspirators planned to "blindside" plaintiff at the June 8, 2020, city council meeting. *Id.* (4AC ¶ 86). They accomplished that "blindside" by having Padilla accuse plaintiff of "'bullying, retaliation, harassment and threats[.]'" *Id.* These accusations allegedly laid the groundwork for "drummed up and false criminal charges" in the future. *Id.* at 18 (4AC ¶ 87).

As time progressed, law enforcement investigated plaintiff in what he calls "The Sham Investigation." *Id.* at 22–25 (4AC ¶¶ 113–27). And two more alleged conspirators joined the ranks: Smith County sheriff Bruce Lehman and assistant Attorney General Adam Zentner—the first state defendant. *Id.* at 22, 25–26 (4AC ¶¶ 110–11, 128). Plaintiff alleges that Smith Center attorney Owen and undersheriff Bailey recruited assistant AG Zentner to handle the investigation because Zentner's expertise in sex crimes furthered their plan to "drum up sex related charges against" plaintiff. *Id.* at 25–26 (4AC ¶¶ 128–30). Then, plaintiff asserts a falsified affidavit caused a judge to issue a warrant allowing law enforcement to seize his phone on July 1, 2020. *Id.* at 30 (4AC ¶¶ 155–56). Rumors began circulating. Plaintiff alleges that people in town heard that plaintiff's phone was seized in a child pornography investigation—which wasn't true. *Id.* at 31 (4AC ¶ 159). And he alleges a whole litany of other confrontations with the alleged conspirators—many occurring at city council meetings—culminating in a recall petition to remove plaintiff from city council. *See id.* at 32–44 (4AC ¶¶ 169–234).

### *Criminal Charges*

Eventually, on May 5, 2021, assistant AG Zentner filed a criminal complaint against plaintiff, asserting for multiple felony offenses. *Id.* at 44, 45 (4AC ¶¶ 235, 237). A judge

dismissed some of the charges because of a Fourth Amendment violation. *Id.* at 45 (4AC ¶ 239). Plaintiff then was acquitted at trial. *Id.* (4AC ¶ 240). Plaintiff alleges all manner of irregularities and inappropriate interference by defendants at trial. *Id.* at 51–53 (4AC ¶¶ 274–77). Later, on July 1, 2021, plaintiff was arrested again—this time for an allegedly false violation of a protection order secured by Padilla. *Id.* at 47, 48 (4AC ¶¶ 250, 253). The Phillips County Attorney declined to file a formal complaint, and thereafter plaintiff was released from jail. *Id.* at 49 (4AC ¶¶ 260, 262). Several weeks later, law enforcement officers seized plaintiff's new phone. *Id.* at 50 (4AC ¶ 268). To seize the phone, undersheriff Bailey secured a warrant with an allegedly false affidavit accusing plaintiff of blackmail and intimidating a witness. *Id.* (4AC ¶¶ 264–68).

### *The Expungement*

Some time later, a Smith County state court judge issued an expungement order for all of plaintiff's charges and proceedings. *Id.* at 56 (4AC ¶ 292). Because of that expungement order, the final individual defendant makes her appearance—Clerk of the District Court of Smith County, Cathi Holt. *Id.* at 4 (4AC ¶ 17). Plaintiff alleges that defendant Holt didn't take the necessary steps to disseminate the judge's expungement order. *Id.* at 56 (4AC ¶¶ 292–93). So, plaintiff's case remained visible to the public for more than a year. *Id.* (4AC ¶ 294). And, when plaintiff and his mother questioned Holt about the public's access to his criminal record, Holt falsely claimed that a person could check it only at the courthouse terminal. *Id.* at 57 (4AC ¶ 297).

The court supplements this general overview with specific facts, as needed, when addressing each cause of action. Next, it outlines the governing legal standard.

## II.        Legal Standard

Defendants assert arguments under two Rule 12(b) provisions, Rule 12(b)(1) and Rule 12(b)(6).  The court recites the legal standard for both at the outset and identifies which standard applies as it moves through the defenses and claims.

### A.        Rule 12(b)(1)

Under Rule 12(b)(1), a defendant may move the court to dismiss for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "Federal courts are courts of limited jurisdiction and, as such, [they] must have a statutory basis to exercise jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002).  "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).  The party invoking federal jurisdiction—here, plaintiff—bears the burden to prove it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 931 (10th Cir. 2018) (presuming "no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction").

Rule 12(b)(1) motions take one of two forms:  a facial attack or a factual attack. *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001).  "A facial attack asserts that the allegations in the complaint, even if true, are insufficient to establish subject matter jurisdiction. By contrast, a factual attack on the complaint challenges the veracity of the allegations upon which subject matter jurisdiction depends." *Cnty. Comm'rs v. U.S. Dep't of the Interior*, 614 F. Supp. 3d 944, 951 (D.N.M. 2022) (quotation cleaned up).  Here, defendants make a facial attack on jurisdiction.  So, the court assumes the allegations in the Amended Complaint are true.

### B.        Rule 12(b)(6)

5

Fed. R. Civ. P. 12(b)(6) allows a party to move to dismiss an action for failing "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). For a complaint to survive a Rule 12(b)(6) motion, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "If, in the end, a plaintiff's 'well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' the complaint fails to state a claim." *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 679).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, the Supreme Court has explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

In conducting its analysis, the court groups the motion-to-dismiss arguments into two categories: those that span across claims and those focused on particular claims. It takes up each category, in turn.

6

**III.        Arguments Spanning Across Claims**

The court begins with arguments and defenses that span across the claims. *First*, the court addresses the state defendants' immunity arguments. *Then*, the court takes up the city and county defendants' bid for dismissal of redundant or inappropriate parties. *Finally*, the court assesses the statute-of-limitations argument asserted by both sets of defendants.

**A.        Immunities**

The state defendants assert Eleventh Amendment immunity, quasi-judicial immunity, prosecutorial immunity, and qualified immunity arguments. Doc. 138 at 5–6, 8–14, 15–16, 19–21. The court reserves its qualified immunity analysis for the end of the Order. It addresses the other immunity arguments now, starting with state sovereign immunity.

**1.        Eleventh Amendment Immunity**

The state defendants assert that Eleventh Amendment immunity protects the State of Kansas as well as Holt and Zentner—in their official capacities—from suit. Doc. 138 at 5–6. While plaintiff's Response argues against some asserted immunity defenses (prosecutorial immunity and qualified immunity), it never responds to state sovereign immunity under the Eleventh Amendment. *See generally* Doc. 143. Indeed, it never mentions this defense, or the Eleventh Amendment, at all. *See generally id.*

"The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019). "This immunity extends to arms of the state and to state officials who are sued for damages in their official capacity." *Id.* State sovereign immunity applies to actions under 42 U.S.C. § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). "'Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil

liberties.'" *Amaro v. New Mexico*, 737 F. App'x 882, 888 (10th Cir. 2018) (quoting *Will*, 491 U.S. at 66).  Where properly raised, Eleventh Amendment immunity deprives the federal courts of subject matter jurisdiction.  *Williams*, 928 F.3d at 1212 ("Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." (quotation cleaned up)).  But, as just mentioned, state sovereign immunity applies to state officials sued in their individual capacity, so "suits seeking damages from state officials in their individual capacities are not barred by the Eleventh Amendment."  *Cornforth v. Univ. of Okla. Bd. of Regents*, 263 F.3d 1129, 1132 (10th Cir. 2001).

There "'are three exceptions to the Eleventh Amendment's guarantee of sovereign immunity to states.'"  *Frank v. Lee*, 84 F.4th 1119, 1130–31 (10th Cir. 2023) (quoting *Levy v. Kan. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1168 (10th Cir. 2015)).  One, "'a state may consent to suit in federal court.'"  *Id.* (quoting *Levy*, 789 F.3d at 1169).  Two, "'Congress may abrogate a state's sovereign immunity by appropriate legislation[.]'"  *Id.* (quoting *Levy*, 789 F.3d at 1169).  "'Finally, under *Ex parte Young*, a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief.'"  *Id.* (quoting *Levy*, 789 F.3d at 1169).

Here, the 4AC asserts claims against the State of Kansas.  Doc. 129 at 1 (4AC).  And it asserts both individual- and official-capacity claims against two state officials:  Holt and Zentner.[2]  *Id.* at 4 (4AC ¶ 17) (alleging Holt was the Clerk of District Court of Smith County, Kansas); *id.* at 3 (4AC ¶ 9) (alleging Zentner was assistant Kansas Attorney General).  Plaintiff

---

[2]    The motion-to-dismiss briefing includes argument to dismiss claims against Bryson Potter, as well.  But the parties agree that plaintiff has abandoned all claims against Potter.  Doc. 143 at 2 n.1 ("The State Defendants are correct that all claims against KBI agent Potter have been abandoned.  Any reference[] to him as a 'defendant' in the [4AC] was inadvertent."); Doc. 149 at 4 ("Plaintiff concedes that all claims against Potter have been abandoned.").  So, this Order doesn't address any claims against Potter because it needn't.  The court dismisses him as a defendant.

8

never invokes consent to suit or congressional abrogation.  *See generally id.*; Doc. 143.  And the 4AC seeks money damages—not prospective relief—thus precluding plaintiff from relying on *Ex Parte Young*.  Doc. 129 at 101 (seeking damages "exceeding three million dollars"); *see generally id.* (never using the terms "prospective," "injunctive," or "declaratory"); *see also K.A. v. Barnes*, 134 F.4th 1067, 1074 (10th Cir. 2025) (explaining that sovereign immunity protects state agencies and state officials sued in their official capacities from claims for damages).  So, none of the three sovereign-immunity exceptions appears to apply.  What's more, plaintiff never argues that they do.

The court thus concludes that it lacks subject matter jurisdiction over plaintiff's claims asserted against the State of Kansas and defendants Holt and Zentner in their official capacities based on Eleventh Amendment immunity.  And it dismisses those claims without prejudice under Rule 12(b)(1).  *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) (instructing that dismissals for lack of jurisdiction "must be without prejudice").  Next, the court considers the state defendants' absolute immunity arguments.

### 2.    Absolute Immunities:  Judicial and Prosecutorial

Defendants Holt and Zentner also argue that they are entitled to absolute immunity from the claims asserted against them in their individual capacities.  The court properly considers absolute immunity arguments under Rule 12(b)(6).  *See Aragon v. Vander Dussen*, No. 23-cv-00674-MIS-KRS, 2023 WL 8602874, at *3 (D.N.M. Dec. 12, 2023) (explaining sovereign immunity "strips the court of jurisdiction and thus renders dismissal appropriate under Rule 12(b)(1)" but "judicial immunity is a non-jurisdictional bar" properly brought under Rule 12(b)(6) (quotation cleaned up)); *Warnick*, 895 F.3d at 751–52 (affirming dismissal of plaintiff's

9

§ 1983 claims under Rule 12(b)(6) based on absolute prosecutorial immunity).  Start with defendant Holt invoking judicial immunity.

### a.      Judicial Immunity

The 4AC alleges that defendant Holt—Clerk of the District Court of Smith County, Kansas—failed to send plaintiff's expungement order to the right place, leaving plaintiff's case accessible to the public until late June 2023.  Doc. 129 at 4, 56 (4AC ¶¶ 17, 291–94).  The 4AC also alleges that Holt falsely informed plaintiff.  She allegedly stated that a person could check plaintiff's record but only from the courthouse terminal.  *Id.* at 57 (4AC ¶ 297).  That "misleading information[,]" plaintiff alleges, "adversely affected his chances of securing legal representation and possibly causing the passage of the statute of limitations for some of his claims."  *Id.* (4AC ¶ 299).  Premised on these allegations, plaintiff asserts a § 1983 equal protection claim and a Kansas common law intentional infliction of emotional distress (IIED) claim against defendant Holt.  *Id.* at 91–92, 97–98 (4AC ¶¶ 425–31, 464–69).

Defendant Holt argues that she's entitled to absolute judicial immunity.  Doc. 138 at 15–16.  This immunity extends to both plaintiff's § 1983 claim and state law tort claim, Holt contends.  *Id.* at 16.  His sprawling case perhaps getting the best of him, plaintiff's Response never addresses—at least not head-on—Holt's assertion of judicial immunity against his § 1983 claim.  *See generally* Doc. 143.  Instead, he contends, curiously, that "Holt appears to assert no defense."  *Id.* at 46.  When it comes to his IIED claim, plaintiff contends that Holt's failure to properly handle the expungement paperwork was a ministerial act, thus not qualifying for immunity under Kansas law.  *Id.* at 50.

"Judicial immunity applies only to personal capacity claims."  *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1156 (10th Cir. 2011).  Judges themselves "are absolutely immune from

civil damages liability for acts performed in their judicial capacities." *Van Deelen v. Fairchild*, No. Civ.A. 05-2017, 2005 WL 3263885, at \*5 (D. Kan. Dec. 1, 2005) (citing *De Young v. Kansas*, 890 F. Supp. 949, 953 (D. Kan. 1995)).  Similarly, our Circuit has "held a court clerk enjoys absolute quasi-judicial immunity when he or she performs a 'judicial act[.]'" *Coleman v. Farnsworth*, 90 F. App'x 313, 317 (10th Cir. 2004); *Clark v. Sellers*, No. 23-3156, 2024 WL 277446, at \*1 (10th Cir. Jan. 25, 2024) ("[S]tate court clerks who performed a judicial function . . . enjoy immunity from a 42 U.S.C. § 1983 suit.").  That immunity extends to state law claims, as well.  *Cox v. Civ. Courthouse State Judges & Staff*, 544 F. Supp. 3d 1180, 1189 (D.N.M. 2021) ("Federal and state law claims against judicial officers. . . are barred by absolute judicial immunity.  It is well settled that the doctrine of judicial immunity is applicable in actions . . . with 42 U.S.C. § 1983 claims as well as state law claims." (quotation cleaned up)).  "In determining whether an act by a judge"—or here, a clerk—"is 'judicial,' thereby warranting absolute immunity, [courts] are to take a functional approach[.]" *Bliven v. Hunt*, 579 F.3d 204, 209–10 (2d Cir. 2009).  That "'immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches[.]'" *Id.* (emphasis in original) (quoting *Forrester v. White*, 484 U.S. 219, 227 (1988)).

Here, defendant Holt allegedly mishandled plaintiff's expungement documents and misinformed plaintiff about the public's access to his records.  The Circuit has held repeatedly that the managing or filing of documents qualifies as a judicial function.  *See Clark*, 2024 WL 277446, at \*1 ("Because [plaintiff's] claims each challenge how the defendants managed the filings in his underlying criminal case, the defendants are entitled to judicial immunity."); *Fishinghawk v. Kissinger*, 764 F. App'x 827, 828 (10th Cir. 2019) (explaining that non-judicial officers "are absolutely immune from liability for their judicial acts even if their exercise of

11

authority is flawed by the commission of grave procedural errors" and finding alleged inaction on plaintiff's notice of appeal qualified as judicial act warranting immunity (quotation cleaned up)); *Trackwell v. U.S. Gov't*, 472 F.3d 1242, 1247 (10th Cir. 2007) (holding "filing of an application" qualifies as "perform[ing] a judicial function" so that clerk "enjoys derivative immunity").

Taking plaintiff's allegations as true, Holt's actions were "flawed by the commission of grave procedural errors." *Fishinghawk*, 764 F. App'x at 828 (quotation cleaned up). In short, she failed to handle his expungement the way she should have. But the Tenth Circuit has determined even such flawed acts are protected by judicial immunity. *Id.* (explaining that non-judicial officers "are absolutely immune from liability for their judicial acts even if their exercise of authority is flawed by the commission of grave procedural errors"). The court thus dismisses plaintiff's individual-capacity claims against Holt—with prejudice—as barred by quasi-judicial immunity. *See Ray v. Quisenberry*, No. CIV-22-823-D, 2023 WL 2447598, at *2, 3 (W.D. Okla. Mar. 10, 2023) (dismissing claims against state judge with prejudice based on judicial immunity), *aff'd*, No. 23-6038, 2023 WL 3634720 (10th Cir. May 25, 2023) (finding no error in decision to dismiss with prejudice claims barred by absolute judicial immunity); *Smith v. Arguello*, 415 F. App'x 57, 61 (10th Cir. 2011) (affirming district court's dismissal of plaintiff's claims for several reasons including "doctrines of judicial immunity" and concluding that "district court properly entered the dismissal with prejudice").

The state defendants' motion also argues that another form of absolute immunity applies—prosecutorial immunity. It's next.

### b.    Prosecutorial Immunity

Defendant Zentner argues that he's entitled to absolute prosecutorial immunity. Doc. 138 at 8–14. He contends that plaintiff's claims against him "run the gamut of functions intimately associated with the judicial phase of the criminal process and performing the traditional functions of an advocate." *Id.* at 9. Plaintiff, for his part, splashes his opposition argument to Zentner's prosecutorial-immunity argument seemingly at random across his 51-page Response. When stitched together, the best the court can glean from plaintiff's brief is this gist: "Zentner lost his right to prosecutorial immunity by providing legal advice, directing the drafting of the affidavits, and having knowledge of false allegations." Doc. 143 at 46.

"Absolute prosecutorial immunity is a complete bar to a suit for damages under 42 U.S.C. § 1983." *Chilcoat v. San Juan County*, 41 F.4th 1196, 1208 (10th Cir. 2022). "Prosecutorial immunity bars claims for damages against a prosecutor sued in her individual capacity." *Blair v. Osborne*, 777 F. App'x 926, 929 (10th Cir. 2019); *Lewis v. Clarke*, 581 U.S. 155, 163 (2017) ("An officer in an individual-capacity action . . . may be able to assert *personal* immunity defenses, such as . . . absolute prosecutorial immunity[.]" (emphasis in original)). Prosecutors benefit from absolute immunity for activities "intimately associated with the judicial phase of the criminal process[.]" *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Prosecutorial immunity is limited, however, to actions that "involve the prosecutor's role as advocate for the State rather than his role as administrator or investigative officer[.]" *Burns v. Reed*, 500 U.S. 478, 491 (1991) (quotation cleaned up); *Mink v. Suthers*, 482 F.3d 1244, 1259 (10th Cir. 2007) (focusing absolute-immunity inquiry on prosecutor's role as an advocate, not "administrator or investigative officer" (quotation cleaned up)).

Thus, "the availability of absolute prosecutorial immunity turns on whether the prosecutor's activities were either intimately associated with the judicial phase of the criminal

13

process (for which absolute immunity is available), or instead were investigative or administrative activities (for which only qualified immunity is available)." *Bledsoe v. Carreno*, 53 F.4th 589, 602 n.13 (10th Cir. 2022) (quotation cleaned up). The Supreme Court has emphasized that functions "undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial . . . are entitled to the protections of absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Such "acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Id.* And activities involving "preparing, analyzing, and presenting pleadings to a court" also qualify. *Mink*, 482 F.3d at 1262. But there's "a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Buckley*, 509 U.S. at 273.

For example, "advising police in the investigative phase of a criminal case could be too far removed from the judicial process to warrant extending immunity on that basis." *Mink*, 482 F.3d at 1260. Specifically, "[a]dvising police on interrogation methods or the existence of probable cause does not qualify" for prosecutorial immunity. *Id.* (quotation cleaned up). Nor does attesting to the accuracy of facts in an affidavit, which doesn't "involve[] the exercise of professional judgment" but instead merely reviews "the truth or falsity of the factual statements themselves." *Kalina v. Fletcher*, 522 U.S. 118, 130 (1997). Finally, activities that implicate "a continuing effort to [secure] evidence" don't qualify for prosecutorial immunity. *Mink*, 482 F.3d at 1262.

14

Here, according to the 4AC, city attorney Owen asked assistant AG Zentner to handle an investigation and prosecution of plaintiff premised on allegations of sexually inappropriate behavior and "bullying, retaliation, harassment and threats." Doc. 129 at 17, 18, 25, 26 (4AC ¶¶ 86, 90, 126, 128, 129). Zentner allegedly contacted Dowling and Presbrey—deputy sheriffs of Smith County—to "counsel[] them on how they should draft an affidavit in support of a warrant to seize Plaintiff's phone based on . . . allegations of stalking and harassment." *Id.* at 3, 17, 26 (4AC ¶¶ 13, 85, 132). Zentner then allegedly directed the deputies about interviewing complaining parties; encouraged suppression or destruction of evidence; instructed the deputies to find evidence of criminal sexual behavior; and encouraged the deputies to falsify the investigation's results. *Id.* at 27, 28, 29 (4AC ¶¶ 137, 145, 146, 151). All of these alleged activities preceded Zentner charging plaintiff with numerous criminal charges—including felony sex crimes, felony criminal threat, and stalking—on May 5, 2021. *Id.* at 44, 45 (4AC ¶¶ 235, 237).

The court concludes these allegations implicate "a continuing effort to [secure] evidence" such that they lean toward the investigative and thus don't qualify for prosecutorial immunity. *Mink*, 482 F.3d at 1262. They involve "[a]dvising police on interrogation methods or the existence of probable cause" which "does not qualify." *Id.* at 1260. And they align with a "detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested[.]" *Buckley*, 509 U.S. at 273. What's more, "fabrication[s] of evidence for the purpose of establishing probable cause" are "allegations of conduct outside the prosecutorial function[.]" *Glaser v. City & County of Denver*, 557 F. App'x 689, 705 (10th Cir. 2014).

The court characterizes two other alleged Zentner activities—both occurred after charges were filed—as similarly investigative in nature. Plaintiff alleges that Zentner joined in a scheme with other defendants "to falsely manufacture a violation of [the] temporary order of protection[.]" Doc. 129 at 47 (4AC ¶ 250). He also allegedly directed undersheriff Bailey to secure a "facially inadequate warrant on a knowingly falsified affidavit accusing Plaintiff of crimes of Blackmail and Intimidation of a Witness." *Id.* at 50 (4AC ¶ 267).

In sum, prosecutorial immunity doesn't bar claims premised on any of these investigative allegations—whether occurring before or after Zentner filed charges. *Glaser*, 557 F. App'x at 705 (parsing conduct and dismissing claims based on conduct within the prosecutorial function but allowing to survive claims based on conduct outside the prosecutorial function). This conclusion applies to plaintiff's claims for retaliation (Count I), illegal search and seizure (Counts II & VIII), false arrest (Count VII), failure to intervene (Count XV), IIED (Count XVI), and civil conspiracy (Count XVII). These claims remain viable against Zentner as premised on his investigative activities.

The rest of the conduct plaintiff alleges—including his choice to prosecute Zentner by filing charges—qualifies as advocacy, however. After filing charges, Zentner allegedly filed a "frivolous" motion to revoke plaintiff's bond premised on another defendant's "frivolous" petition for an order of protection. Doc. 129 at 46 (4AC ¶¶ 243–45). Later, Zentner filed another "frivolous" motion—this time for civil contempt—which he supported before the state court with "relentless false and misleading argument[.]" *Id.* at 51 (4AC ¶¶ 272–73). At the criminal trial, plaintiff alleges that Zentner repeatedly failed to object; knowingly made numerous false or misleading statements to the jury; directed the deputies to delete crucial text

16

messages and manufacture an incomplete call log; and encouraged a witness to perjure himself. *Id.* at 51–53 (4AC ¶ 274).

All this conduct is "intimately associated with the judicial phase of the criminal process[.]" *Imbler*, 424 U.S. at 430. Zentner chose to charge and prosecute plaintiff—and not others, like Wiehl, who plaintiff alleges Zentner should have charged. *See Carbajal v. Morrissey*, No. 12-cv-03231-REB-KLM, 2014 WL 1301532, at *17 (D. Colo. Mar. 31, 2014) ("The decision of a prosecutor to file criminal charges is within the set of core functions which is protected by absolute immunity. This is so even if the prosecutor makes that decision in a consciously malicious manner, or vindictively, or without adequate investigation, or in excess of his jurisdiction." (quotation cleaned up)); *Ysais v. N.M. Jud. Standard Comm'n*, 616 F. Supp. 2d 1176, 1193 (D.N.M. 2009) (dismissing claims against attorney who didn't investigate other misconduct because "the decision whether to investigate and prosecute is a prosecutorial act protected by absolute prosecutorial immunity"), *aff'd sub nom.*, *Ysais v. New Mexico*, 373 F. App'x 863 (10th Cir. 2010). Zentner filed motions. *See Benavidez v. Howard*, 931 F.3d 1225, 1232 (10th Cir. 2019) (holding "attorney who, in the course of a civil adjudication, prepares a motion and arranges for the presentation of evidence on the court record by way of affidavit in support of the motion, is absolutely immune from a collateral § 1983 suit for damages based on the filing of such motion and affidavit."). Zentner argued at trial. *Glaser*, 557 F. App'x at 705 ("A prosecutor's statements in the courtroom and in pleadings that are relevant to the subject matter of the proceeding are likewise absolutely immune."). Zentner's trial conduct is immune even "from claims that he knowingly used false testimony and suppressed material evidence in a trial." *Id.* Nor do allegations of malice overcome absolute immunity. *Id.*; *see* Doc. 129 at 80,

17

83, 91 (4AC ¶¶ 352–53, 371, 422) (relying on defendants' alleged "ulterior motive" for abuse of process claims).

Claims premised on this conduct that "falls within the prosecutorial function of initiating and pursuing a criminal prosecution" are subject to dismissal. *Glaser*, 557 F. App'x at 705. This conclusion applies to plaintiff's claims for malicious prosecution (Counts III, V & IX), abuse of process (Counts IV, VI, & X), equal protection (Count XI), retaliatory prosecution (Count XII), and violation of procedural due process at trial (Count XIV). The court dismisses these claims against Zentner with prejudice. *Id.* at 706 (affirming dismissal with prejudice of claims against district attorney defendants protected by prosecutorial immunity).

### 3.    Immunities Conclusion

The court pauses to recap where plaintiff's claims stand after its analysis of Eleventh Amendment, judicial, and prosecutorial immunity.

*Eleventh Amendment Immunity*:  The court lacks subject matter jurisdiction over claims against the State of Kansas and against Cathi Holt and Adam Zentner in their official capacities. So, the court dismisses those claims without prejudice under Rule 12(b)(1).

*Judicial Immunity*:  The court dismisses all individual-capacity claims against Cathi Holt with prejudice under Rule 12(b)(6).

*Prosecutorial Immunity*:  The court dismisses the following individual-capacity claims against Adam Zentner with prejudice under Rule 12(b)(6):  malicious prosecution (Counts III, V, & IX), abuse of process (Counts IV, VI, & X), equal protection (Count XI), retaliatory prosecution (Count XII), and violation of procedural due process at trial (Count XIV).

The court turns now to the next argument from defendants that spans across the claims— this time advanced by the city and county defendants.

B.        **Redundant or Inappropriate Defendants**

The city and county defendants argue for dismissal of particular types of claims and particular defendants as either redundant or inappropriate. *First*, they contend that suing both the city or county and city or county employees in their official capacities is redundant. Doc. 137 at 4. *Second*, they assert that the claims against the Board of County Commissioners and the official-capacity claim against Sheriff Lehman are similarly redundant, but they request a specific remedy—dismissing the Board. *Id. Finally*, they argue that the Smith County Sheriff's Department (SCSD) isn't an entity subject to suit. *Id.* at 3. Plaintiff's Response fails to address any of these arguments directly. *See generally* Doc. 143 (never using the words "redundant" or "duplicative"); *id.* at 48 n.3 (addressing SCSD's status as party only when requesting amendment to add Sheriff Lehman). The court concludes the city and county defendants are right—for the most part.

*First*, suing both the city or county and the city or county employees in their official capacities is redundant. *White v. City of Grandview Plaza*, No. 16-4162-DDC-KGS, 2017 WL 2215133, at *10 (D. Kan. May 19, 2017) ("Our court routinely dismisses official capacity claims against individuals sued in their official capacities when the government entity also is named as a defendant in the lawsuit because the official capacity claims against the individuals are duplicative."); *Brooks v. Cornwell*, No. 15-9150-KHV, 2016 WL 5661567, at *3 (D. Kan. Sept. 30, 2016) (dismissing as redundant official-capacity claims where plaintiff sued city directly). So, the court dismisses without prejudice the official-capacity claims against defendants who are city and county employees—Wiehl (Smith Center mayor); Padilla (Smith Center director of economic development); Owen (Smith Center attorney, Smith County prosecutor); Lehman (Smith County sheriff); Bailey (Smith County undersheriff); Presbrey (Smith County deputy

19

sheriff); and Conaway (Smith County deputy sheriff).  *See Weiss v. Vasquez*, No. 21-cv-01533-CNS-NRN, 2023 WL 142531, at *2 (D. Colo. Jan. 10, 2023) (dismissing without prejudice redundant official-capacity claims against city employees), *aff'd sub nom.*, *Weiss v. Town of Elizabeth*, No. 23-1042, 2023 WL 6389042 (10th Cir. Oct. 2, 2023).  Combining this conclusion with the court's earlier dismissal of official-capacity claims against the state defendants under Eleventh Amendment immunity means that no official-capacity claims survive.

*Second*, suing both the sheriff in his official capacity and the Board of County Commissioners is redundant.  *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) (asserting a claim "against [a sheriff] in his official capacity, . . . is the same as bringing a suit against the county"); *Folts v. Grady Cnty. Bd. of Cnty. Comm'rs*, No. 15-996-M, 2017 WL 11557921, at *7 (W.D. Okla. July 25, 2017) (dismissing official-capacity claims against sheriff because "when the plaintiff has sued both the Sheriff and the Board of County Commissioners" it's duplicative in that "theory of liability against both parties was actually seeking liability against a sole entity—the County").  But for this one defendant—the sheriff—a different result should follow, defendants contend.  They ask the court to dismiss the Board of County Commissioners—not the official-capacity claims against the sheriff—alluding to the independence of sheriffs under Kansas law.  Doc. 137 at 4.  But this approach effectively would eliminate—in the name of redundancy—plaintiff's *Monell* claim against any county entity.  The better approach—and the approach used in *Folts*—dismisses the official-capacity claims against the sheriff, thus addressing any redundancy without collateral consequence.  2017 WL 11557921, at *7.  The court already has dismissed the official-capacity claim against Sheriff Lehman and declines defendants' invitation to change course.

*Finally*, a plaintiff can't assert § 1983 claims against a sheriff's office.  *See Moore v.*

20

*Diggins*, 633 F. App'x 672, 677 (10th Cir. 2015) ("[Plaintiff's] claim against the Denver Sheriff's Department fails because it is not a suable entity under § 1983."); *London v. Wyandotte Cnty. Sheriff's Dep't*, No. 25-3022-JWL, 2025 WL 604975, at *2 (D. Kan. Feb. 25, 2025) (collecting cases and dismissing sheriff's department as defendant because "County Sheriff's Department is not a suable entity under § 1983"); *Blackman v. Sedgwick Cnty. Jail*, No. 22-3262-JWL-JPO, 2022 WL 11745171, at *1 (D. Kan. Oct. 20, 2022) (same).  So, the court dismisses the SCSD with prejudice because it's an improper defendant.  *See Bowers v. Hice*, No. CIV-25-493-D, 2025 WL 2715266, at *2 (W.D. Okla. Sept. 5, 2025) (dismissing improper defendant with prejudice), *report and recommendation adopted*, 2025 WL 2714552 (W.D. Okla. Sept. 23, 2025).

Having thus dismissed all official-capacity claims, as well as dismissing SCSD as a defendant, the court moves to the final argument in this section:  the statue of limitations defense.

## C.    Claims Barred By Statute of Limitations

Both sets of defendants assert statute-of-limitations defenses.  Doc. 137 at 7, 8, 10; Doc. 138 at 7–8.  They contend that plaintiff can only recover damages for acts occurring after May 5, 2021—two years before plaintiff filed this lawsuit.  Doc. 137 at 8; Doc. 138 at 7; *see* Doc. 1 (Complaint filed May 5, 2023).  Plaintiff responds that none of the claims are time-barred because the continuing-violation doctrine applies, as does equitable tolling.  Doc. 143 at 25. Plaintiff also contends that the discovery rule saves his untimely illegal-search-and-seizure claim.  *Id.* at 27–28.  The court finds the right answer somewhere in between the parties' positions.

### 1.    Governing Law

21

Congress didn't establish a statute of limitations for § 1983 claims. *Owens v. Okure*, 488 U.S. 235, 239 (1989). Instead, the personal-injury statute of limitations for the state where the federal district court sits supplies the appropriate limitations period. *Id.* at 239, 249–50; *Brown v. Unified Sch. Dist 501, Topeka Pub. Schs.*, 465 F.3d 1184, 1188 (10th Cir. 2006) ("The forum state's statute of limitations for personal injury actions governs civil-rights claims under both 42 U.S.C. § 1981 and § 1983."). In Kansas, the statute of limitations for personal-injury claims is two years. Kan. Stat. Ann. § 60-513(a)(4); *see also Eikenberry v. Seward County*, 734 F. App'x 572, 575 (10th Cir. 2018) (applying two-year Kansas statute of limitations to § 1983 claim).

Applying the two-year Kansas statute of limitations here, any conduct before May 5, 2021 is time-barred—unless a doctrine or rule changes that outcome. Here, plaintiff advances three exceptions: the continuing-violation doctrine; equitable tolling; and the discovery rule apply. The court considers all three, below.

### 2.    Continuing Violation Doctrine

The Tenth Circuit has held "that a § 1983 litigant may rely on the continuing-violation doctrine to overcome the statute of limitations where the first in a series of acts giving rise to a single violation occurs outside of the limitations period[.]" *Herrera v. City of Espanola*, 32 F.4th 980, 997 (10th Cir. 2022). The doctrine applies "when the plaintiff's claim seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act, as opposed to conduct that is a discrete unlawful act." *Hamer v. City of Trinidad*, 924 F.3d 1093, 1098 (10th Cir. 2019) (quotation cleaned up). The doctrine "tethers conduct from both inside and outside the limitations period into one single violation that, taken as a whole, satisfies the applicable statute of limitations." *Id.* at 1100. Whether it applies thus largely turns on whether "the allegedly unlawful acts at issue in [the] lawsuit . . . [are] discrete, as opposed to continual,

22

acts." *Id.* at 1099. "The [continuing-violation] doctrine does not allow a plaintiff to challenge discrete acts of wrongful conduct which occurred outside of the statute of limitations." *Brock v. Herbert*, 435 F. App'x 759, 763 (10th Cir. 2011).

Plaintiff's continuing-violation argument here invokes *Robinson v. Maruffi*, 895 F.2d 649 (10th Cir. 1990). *See* Doc. 143 at 25–26. There, Robinson asserted a civil-rights action against three police officers. He alleged that the officers participated in a malicious-prosecution conspiracy to frame him for another officer's murder that ultimately led to Robinson's arrest and imprisonment. 895 F.2d at 650–53. A jury eventually acquitted Robison, and he subsequently sued the officers for civil-rights violations. *Id.* at 653. The officers argued that each overt act furthering the conspiracy occurred outside the limitations period. *Id.* at 654. The trial court rejected the officers' argument, and the Circuit affirmed. *Id.* at 654–55.

The Circuit concluded that the conspiracy claim didn't accrue until Robinson's acquittal—which occurred *within* the limitations period. *Id.* at 655. And the Circuit was persuaded that the accompanying false-arrest and false-imprisonment claims "were essentially part of the malicious prosecution conspiracy." *Id.* That is, the Circuit agreed with the trial judge's decision to "disregard[] the defendants' characterization of the case as discrete claims and acts[.]" *Id.* (quotation cleaned up). Instead, the trial judge—and the Circuit—"accepted the plaintiff's characterization that [it] was one conspiracy to frame Robinson and was a single continuing violation of plaintiff's constitutional rights tied together by a plan to get [him] at all costs." *Id.* (quotation cleaned up). The same dispute emerges here. Defendants argue for a discrete-acts characterization; plaintiff argues for a single-continuing-violation characterization. As is often the case, the answer lies somewhere in the middle.

23

*Herrera* differentiates discrete acts from a single continuing violation by invoking *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002)—the Supreme Court opinion first recognizing the continuing-violation doctrine. 32 F.4th at 993, 999. *National Railroad Passenger* applied the continuing-violation doctrine to a hostile-work-environment claim in the Title VII context. *Id.* at 999. It explained that a hostile work environment "cannot be said to occur on any particular day" but "over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger*, 536 U.S. at 115. *Herrera* clarifies this concept, describing a continuing-violation claim as "one where the injury sued upon arose *only after* a series of connected events that together form a single violation of . . . constitutional rights." 32 F.4th at 999 (emphasis added). Claims of discrete incidents, meanwhile, may "challenge a series of unlawful acts," with each of them "constitut[ing] an alleged violation." *Id.* To determine the nature of the claim—continuing or discrete— the "emphasis . . . should not be placed on mere continuity but on whether any present *violation* existed." *Nat'l R.R. Passenger*, 536 U.S. at 112 (emphasis in original) (quotation cleaned up).

Here, defendants home in on the language plaintiff uses—*first*, in his 4AC and, *then*, in his Response to the current motion—to argue that plaintiff alleges discrete constitutional violations. Doc. 138 at 7–8; Doc. 150 at 2. Consider, they argue, plaintiff's First Amendment retaliation claim. The 4AC alleges that defendants retaliated by "engag[ing] in . . . discrete incidents of conduct against Plaintiff[.]" Doc. 129 at 60–72 (4AC ¶ 316). At first glance, then, it seems plaintiff has conceded in his Complaint the discrete-acts characterization. The retaliation claim lists 45 individually dated events, 31 of which occurred before May 5, 2021—the opening bell for the limitations period. *Id.* But then again, in the same vagabond sentence, plaintiff also

24

describes these "discrete incidents" as a "coordinated conspiracy[.]" *Id.* Plaintiff, in short, wants the benefits of eating his cake and those of having it as well.

Likewise, in his Response, plaintiff first identifies the alleged retaliation conduct as part "of a plan to discredit Plaintiff and have him falsely accused of crimes for exercising his First Amendment rights[,]" suggesting a single violation. Doc. 143 at 26. But then, just one sentence later, he argues that "many of these actions, in addition to being retaliatory in violation of Plaintiff's First Amendment rights . . . *were themselves violations* of Plaintiff's rights[.] *Id.* at 27 (emphasis added). So, the pendulum swings from one single, continuing violation to a set of discrete acts that each violated his First Amendment rights. And then, before the paragraph ends, it swings back again. Plaintiff finishes the paragraph by arguing that "all the events alleged in the [4AC] are 'tied together by a plan to "get" [Plaintiff] at all costs[.]'" *Id.* (quoting *Robinson*, 895 F.2d at 655). Close readers may experience whiplash.

The court concludes such back-and-forth pleading is inconsistent with a finding that the continuing-violation doctrine applies to plaintiff's retaliation claim. *See Herrera*, 32 F.4th at 996 (concluding from portions of plaintiffs' briefs that plaintiff "viewed each refusal . . . as a discrete violation" because plaintiff employed language like "a separate and discrete action"); *Hamer*, 924 F.3d at 1101 (citing language in plaintiff's brief to conclude plaintiff viewed each denial as a separate violation and abandoned continuing-violation doctrine). And the retaliation claim serves only as an example. The 4AC routinely—and unartfully—pleads claims both as discrete-act claims and as part of a single, continuing conspiracy. The court concludes it must parse the claims and apply the continuing violations doctrine to the conspiracy claim, but not the discrete-act claims.

So, the court dismisses the following *discrete* claims, with prejudice, as time-barred: the retaliation claim to the extent it's predicated on events before May 5, 2021; plaintiff's § 1983 claim premised on the alleged illegal search and seizure of plaintiff's phone on July 1, 2020 (Count II); and plaintiff's § 1983 procedural-due-process claim (Count XIII) premised on the public meetings held from June 2020 to March 2021 and the allegedly sham investigation. *See Gee v. Pacheco*, 627 F.3d 1178, 1181 (10th Cir. 2010) (affirming district court's dismissal with prejudice of several claims "because they [were] clearly barred by the statute of limitations"). To hold otherwise essentially would erase the statute of limitations for discrete act claims anytime a plaintiff throws in a conspiracy claim.

But plaintiff also relies on that same untimely conduct for his § 1983 conspiracy claim. *See* Doc. 129 at 98–99 (4AC ¶ 471). And the conspiracy claim, as pleaded here, qualifies as a claim alleging a single continuing violation. *See Herrera*, 32 F.4th at 995 n.8. (clarifying that *Robinson* "discussed the availability of the continuing violation doctrine in an action alleging a conspiracy"); *see also Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir. 1994) (explaining that *Robinson* "held that an allegation of a conspiracy constitutes a viable claim under § 1983, even if the alleged conspiracy began at a point that would be barred by the statute of limitations."). So, the continuing-violation doctrine applies to plaintiff's conspiracy claim.

### 3. Equitable Tolling

Attempting to rescue any time-barred claims, plaintiff also invokes equitable tolling. "In a § 1983 action, we look to state law for tolling rules." *Shrum v. Cooke*, 60 F.4th 1304, 1308 (10th Cir. 2023). Plaintiff contends that Holt's mismanagement of his expungement created his difficulty securing counsel, delaying his initial Complaint by nearly one year. Doc. 143 at 28. But the Tenth Circuit expressly has rejected equitable tolling premised on difficulty hiring

counsel—in the pro se prisoner context. *Williams v. Miller*, 264 F. App'x 724, 726 (10th Cir. 2008) (rejecting plaintiff's argument that "inability to hire counsel"—among other reasons— excused delay and warranted equitable tolling); *Foldenaur v. Franklin*, 261 F. App'x 93, 95 (10th Cir. 2008) (concluding that delay resulting from "time it took for his family to raise resources and hire counsel" didn't justify equitable tolling). The court sees no reason why a different outcome should apply to plaintiffs who aren't prisoners. And, in any event, plaintiff doesn't explain how Holt's alleged mismanagement affected his ability to retain counsel. *See* Doc. 129 at 56–57 (4AC ¶¶ 289–99). That's a problem because it's plaintiff's burden to establish equitable tolling. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Plaintiff has failed to shoulder that burden here. The court thus declines to apply equitable tolling to salvage plaintiff's time-barred claims.

### 4.    Discovery Rule

Finally, plaintiff contends that the discovery rule should apply to the first search of plaintiff's phone in July 2020. Doc. 143 at 28. He argues that he "had no reason to know that Presbrey [had] failed to get a second warrant to *search* the phone until discovery was obtained after the filing of criminal charges on May 5, 2021." *Id.* (emphasis in original). Plaintiff needs the discovery rule because claims "arising out of police actions toward a criminal suspect, such as . . . search and seizure, are presumed to have accrued when the actions actually occur." *Beck v. City of Muskogee Police Dep't*, 195 F.3d 553, 558 (10th Cir. 1999) (quotation cleaned up).

"Under the discovery rule, the cause of action accrues when the plaintiff knows or with reasonable diligence should have known of the injury and its cause." *Nowell v. Medtronic, Inc.*, No. 19-2073, 2021 WL 4979300, at *2 (10th Cir. Oct. 27, 2021) (quotation cleaned up). In other words, "the statute of limitations begins when the plaintiff acquires knowledge of facts,

conditions, or circumstances which would cause a reasonable person to make an inquiry leading to the discovery of the concealed cause of action." *Id.* (quotation cleaned up). But the facts pleaded in the 4AC show plaintiff knew of his alleged search-and-seizure injury long before May 5, 2021.

For starters, plaintiff challenged the search warrant and its basis when the search occurred—in July 2020. He asked "the deputies several times why they needed his phone when they already had all the subject communications" and he inquired "why they do not just interview him about the messages." Doc. 129 at 30 (4AC ¶ 156). And, when he didn't receive his phone back by August 2020, he "went to speak with Sheriff Lehman about the seizure of his phone." *Id.* at 31 (4AC ¶ 162). Plaintiff's own actions demonstrate that he possessed the requisite knowledge of his injury at the time of the search and—if not then—by August 2020 at latest. The discovery rule thus doesn't help plaintiff revive his untimely illegal-search-and-seizure claim (Count II). An August 2020 discovery makes his claim untimely under Kansas's two-year limit.

### 5.    Statute-of-Limitations Conclusions

Having completed its statute-of-limitations analysis, the court supplies the following summary. The statute of limitations precludes plaintiff from relying on any untimely conduct to support his retaliation claim (Count I). Here, this ruling means all pre-May, 5 2021 conduct. And the court dismisses as untimely plaintiff's July 2020 illegal search-and-seizure claim (Count II) with prejudice. It likewise dismisses as time-barred plaintiff's procedural-due-process claim (Count XIII), again, with prejudice. But plaintiff may rely on untimely conduct for his civil-conspiracy claim (Count XVII), provided that at least one act in furtherance of the conspiracy

28

occurred during the limitations period.  Neither equitable tolling nor the discovery rule mandate a different result.

The court shifts gears now, moving from defendants' arguments that span multiple claims to tackle each of the 18 individual claims asserted by the 4AC.  Following defendants' lead, the court addresses *Monell* liability first.

## IV.    Arguments Focused on Particular Claims

### A.    *Monell* Liability

Plaintiff asserts a *Monell* liability claim against Smith Center, Smith County, SCSD, and the State of Kansas.  Doc. 129 at 100 (4AC).  This Order already dismissed SCSD (as a non-suable entity) and the State of Kansas (as entitled to sovereign immunity).  *See* § III.A.1, B.  So, the court considers these *Monell* claims only as they apply to the city and county.[3]

Plaintiff alleges that the city and county are liable for inadequately supervising and training their officers, staff, agents, and employees.  Doc. 129 at 100 (4AC ¶ 478).  Specifically, plaintiff alleges these entities failed to prepare their employees for "investigations and prosecutions in small communities[.]"  *Id.*  And, plaintiff alleges, these entities had a policy or custom "to keep and maintain government power in the hands of a select few individuals[.]"  *Id.*

---

[3]    Plaintiff requests that the court interpret the *Monell* claim against SCSD as a claim against Sheriff Lehman in his official capacity.  Doc. 143 at 48 n.3.  He explains that "[p]laintiff's counsel inadvertently did not include Lehman as a defendant in this claim[.]"  *Id.*  And so plaintiff "moves for leave to amend to add [Lehman] as a defendant in this [*Monell* liability] claim."  *Id.* at 49.  But that's not the way to request leave to amend.  *See Sullivan v. Univ. of Kan. Hosp. Auth.*, 844 F. App'x 43, 52 (10th Cir. 2021) (holding plaintiff "failed to properly seek leave to amend" where he "made perfunctory, conditional requests in his responses to the motions to dismiss"); *see also Albers v. Bd. of Cnty. Comm'rs*, 771 F.3d 697, 706 (10th Cir. 2014) ("[A] bare request to amend in response to a motion to dismiss is insufficient to place the court and opposing parties on notice of the plaintiff's request to amend and the particular grounds upon which such a request would be based.").  Besides, plaintiff's counsel has had five distinct opportunities to get his Complaint right—*five*.  His repeated requests to amend have delayed this case significantly, to the tune of nearly three years before reaching this first dispositive ruling.  Plaintiff's counsel has had ample opportunity to line up his ducks.  He's stuck with those ducks now.

(4AC ¶ 479).  Finally, plaintiff alleges that final policymakers engaged in the alleged conduct—

listing those policymakers as Mayor Wiehl, City Attorney Owen, and Undersheriff Bailey.  *Id.*

(4AC ¶ 481).

### 1.    *Monell* Legal Standard

A plaintiff may not assert a § 1983 claim against a municipal entity unless he establishes

that a governmental policy or custom caused his injuries.  *See Monell v. Dep't of Soc. Servs. of*

*City of N.Y.*, 436 U.S. 658 (1978).  Municipal liability is limited to those situations "when

execution of a government's policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]"  *Id.* at

694.  To establish municipal liability under § 1983, "'a plaintiff must show 1) the existence of a

municipal policy or custom, and 2) that there is a direct causal link between the policy or custom

and the injury alleged.'"  *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)

(quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).  In short, to "survive a

motion to dismiss, an official capacity claim must allege sufficient facts to show that a specific

policy or custom was the moving force behind the alleged violation."  *Dalcour v. City of*

*Lakewood*, 492 F. App'x 924, 930 (10th Cir. 2012).

A plaintiff may establish such municipal policy or custom by alleging facts capable of

demonstrating any one of the following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a
> widespread practice that, although not authorized by written law or express
> municipal policy, is so permanent and well settled as to constitute a custom or usage
> with the force of law; (3) the decisions of employees with final policymaking
> authority; (4) the ratification by such final policymakers of the decisions—and the
> basis for them—of subordinates to whom authority was delegated subject to these
> policymakers' review and approval; or (5) the failure to adequately train or
> supervise employees, so long as that failure results from deliberate indifference to
> the injuries that may be caused.

30

*Bryson*, 627 F.3d at 788 (quotation cleaned up).

### 2.      *Monell* Analysis

Here, the court construes the 4AC to assert three different theories of municipal liability: failure to supervise and train, municipal policy or custom, and final policymaker decisions.  Take them in turn.

#### a.      Failure to Train or Supervise

The 4AC first invokes the failure-to-train-or-supervise theory,[4] identifying an alleged absence of training about "investigations and prosecutions in small communities[.]"  Doc. 129 at 100 (4AC ¶ 478).  The city and county defendants contend that plaintiff never alleges a particular lack of knowledge that training would have addressed.  Doc. 137 at 5.

The failure-to-train method to demonstrate municipal policy or custom requires deliberate indifference.  That is, plaintiff must show either "a pattern of prior similar misconduct" or that the need for training was "so obvious" and the current training's inadequacy "so likely to result in the violation of constitutional rights" that policymakers demonstrated deliberate indifference. *Waller v. City & County of Denver*, 932 F.3d 1277, 1288 (10th Cir. 2019) (quotation cleaned up). Deliberate indifference claims bring with them "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotation cleaned up).  The failure-to-train theory is the

---

[4]      In the 4AC, plaintiff seemingly lumps his failure-to-train and failure-to-supervise theories together.  *See* Doc. 129 at 100 (4AC ¶ 478) (alleging defendants inadequately "supervise[d] and traine[ed]" their officers).  Plaintiff briefly—and in conclusory fashion—mentions that eight defendants believed they could get away with the hundreds of facts alleged in this lawsuit because they lacked proper monitoring or supervision.  The court doesn't construe this sole, conclusory allegation as asserting a separate failure-to-supervise theory.  Indeed, plaintiff lumps training and supervision together in his Response.  Doc. 143 at 49.  So, the court focuses its efforts on plaintiff's claim that defendants needed specialized training on small towns.

"most tenuous" theory available to support municipal liability because it's necessarily "nebulous" and "removed from the constitutional violation[.]" *Id.* (quotation cleaned up).

Plaintiff's allegations here can't support this "most tenuous" theory. *Id.* Plaintiff never alleges a pattern of similar misconduct—apart from his own experiences—that would suggest the city and county defendants routinely behaved as alleged. Nor is the need for training about small communities "so obvious" that its absence is "likely to result in the violation of constitutional rights[.]" *Waller*, 932 F.3d at 1288. What's more, plaintiff never identifies, specifically, how small-town training would have prevented the alleged violations. He simply asserts that training about investigations in small communities was missing. Doc. 143 at 49. Such bare allegations don't suffice to state a failure-to-train claim. *See Herbel v. City of Marion*, No. 24-cv-2224-HLT-GEB, 2024 WL 4416849, at *26 (D. Kan. Oct. 4, 2024) (explaining that it isn't "sufficient to merely allege general ways in which training was insufficient"). In short, plaintiff hasn't "alleged what additional specialized training or knowledge officers needed to be better equipped[.]" *Teetz v. Bd. of Cnty. Comm'rs*, No. 22-1134-EFM, 2023 WL 7698030, at *8 (D. Kan. Nov. 15, 2023). Finally, and independently, a plaintiff can't state a cognizable failure-to-train claim against a municipality "when the situation's proper response is obvious to all without training[.]" *Id.* (quotation cleaned up). Any training about the unique dynamics of working in a small town and how to respond properly to that context are sufficiently "obvious to all" who live there "without training[.]" *Id.* So, the court dismisses plaintiff's *Monell* liability claim as premised on a failure-to-train theory. Plaintiff's power-policy theory fares no better.

### b.  Power Policy or Custom

The 4AC also alleges a municipal policy or custom "to keep and maintain government power in the hands of a select few individuals[.]" Doc. 129 at 100 (4AC ¶ 479). And it asserts

32

the city and county defendants maintained this power hierarchy "by unlawfully retaliating against anyone who challenged that power or the corruption it had fostered[.]" *Id.* The city and county defendants respond that plaintiff's power-policy theory of liability is both conclusory and illogical. Doc. 137 at 5. They contend that a "city has its power, regardless of who its officer holders are." *Id.* Instead, they argue, the 4AC alleges behavior consistent with individuals attempting to deflect criticism about themselves individually. *Id.* And they suggest two alternative motives for that individual behavior—not linked to a municipal policy or custom: a desire to cling to their own individual power or an exercise of "personal animus" toward plaintiff. *Id.*

Because plaintiff never alleges a specific, formal city or county policy, the court construes plaintiff's 4AC to invoke the second vehicle a plaintiff may use to assert *Monell* liability—informal custom. A plaintiff may state a *Monell* claim based on "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law[.]" *Bryson*, 627 F.3d at 788. "[T]o establish a custom, the actions of the municipal employees must be 'continuing, persistent and widespread.'" *Carney v. City & County of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (quoting *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993)). "[T]o prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Id.*; *see also Huff v. City of Aurora*, No. 21-cv-2715-RMR-NRN, 2022 WL 4131438, at *11 (D. Colo. Sept. 12, 2022) (dismissing informal-custom claim when plaintiff did not "point to specific incidents . . . where similarly situated individuals were mistreated in the same manner"). "With informal, unwritten

33

policies, customs, or practices, the plaintiff can plead either a pattern of multiple similar instances of misconduct . . . or use other evidence, such as a police officers' statements attesting to the policy's existence." *Duran v. Colbert*, No. 16-cv-805 CW, 2023 WL 2742738, at *5 (D. Utah Mar. 31, 2023) (quotation cleaned up).

Here, plaintiff never identifies any specific incidents showing similarly situated individuals mistreated in the same manner. Nor does his 4AC ever allege any facts attesting that the power policy exists. He just baldly asserts that such a policy allowed defendants to act with impunity against him (and him alone)—never substantiating that assertion with any non-conclusory factual allegations. Doc. 143 at 49. The court concludes plaintiff hasn't alleged a plausible *Monell* liability claim premised on a policy or custom to keep certain individuals in power. *See Mocek v. City of Albuquerque*, 813 F.3d 912, 934 (10th Cir. 2015) (affirming dismissal of municipal-liability claim that alleged city had "policy and custom of prohibiting lawful photography at the airport and retaliating against those who filmed at the airport," because plaintiff "cites no particular facts in support of these 'threadbare recitals of the elements of a cause of action'" (quoting *Iqbal*, 556 U.S. at 678)).

Plaintiff makes one final tack to get his *Monell* liability claim to stick. The court takes it up, next, in part c.

### c.       Policymakers

The 4AC also alleges that final policymakers engaged in misconduct and also ratified the misconduct of their subordinates. Doc. 129 at 100 (4AC ¶ 481). And it lists Wiehl, Owen, and Bailey as those final policymakers. *Id.* The city and county defendants contend that these alleged final policymakers can't qualify for that status—as a matter of law. Doc. 137 at 5. And they cite cases in support of this contention. *Id.* (first citing *Dempsey v. City of Baldwin*, 143 F.

App'x 976, 989 (10th Cir. 2005); and then citing *Dechant v. Grayson*, No. 20-cv-02183-HLT, 2021 WL 63280, at *3 (D. Kan. Jan. 7, 2021)). Plaintiff's only response to this authority is to list the job titles of the three ostensible policymakers—"the mayor, county attorney, and Undersheriff Bailey." Doc. 143 at 49. That's it. No other discussion follows. That's not enough.

"The inquiry of whether a government employee is a policy-making official is a question of state law." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010). The relevant question turns on "'delegations of *legal power*.'" *Id.* (emphasis in original) (quoting *Milligan-Hitt v. Bd. of Trs.*, 523 F.3d 1219, 1227 (10th Cir. 2008)). Our Circuit has identified three factors that help courts determine whether an official serves as a municipality's final policy maker:

> (1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decisions are final—*i.e.*, are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.

*Id.* (quotation cleaned up). "To sufficiently state a *Monell* claim based on the alleged decisions of final policymakers, a plaintiff must allege facts indicating that the policymakers had 'final policy making authority . . . on the basis of a decision specific to a particular situation.'" *Marshall v. Dix*, 640 F. Supp. 3d 1033, 1068 (D. Colo. 2022) (quoting *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1250 (10th Cir. 1999)).

The parties neglect to discuss these controlling factors. But quick review of the case law cited by the city and county defendants suggests job titles alone—all that plaintiff offers—don't suffice to support a final policymaker allegation. Our Circuit has found, for example, that a city mayor doesn't qualify—by status as mayor alone—as a final policymaker. *See Dempsey*, 143 F. App'x at 989 (finding "no evidence that the City Council delegated its authority to the Mayor"

35

when considering whether mayor qualified as final policymaker at summary judgment). The same goes for undersheriffs. *See Dechant*, 2021 WL 63280, at *3 ("The undersheriff serves at the pleasure of the sheriff, and there is no statutory delegation of authority from sheriff to undersheriff." (citing Kan. Stat. Ann. § 19-803)); *Est. of Hammers v. Douglas Cnty., Kan. Bd. of Comm'rs*, 303 F. Supp. 3d 1134, 1146–47 (D. Kan. 2018) (finding an undersheriff doesn't qualify under Kansas law as final policymaker). Plaintiff also cites Owens's position as county attorney, Doc. 143 at 49, but our court has held that county attorneys are final policymakers when it comes to prosecuting criminal cases on behalf of the *state*—not the county. *Wilson v. City of Chanute*, 43 F. Supp. 2d 1202, 1216 (D. Kan. 1999) (granting summary judgment on *Monell* claim against county—where plaintiff attempted to attribute county attorney's actions to county—because county attorney was final policy maker for state, not county).

In sum, plaintiff has relied entirely upon job titles to demonstrate final-policymaker status. But that won't suffice. What's more, our Circuit requires plaintiffs seeking to establish municipal liability to center their policymaker analysis on "a decision specific to a particular situation." *Murell v. Sch. Dist. No. 1, Denv.*, 186 F.3d 1238, 1250 (10th Cir. 1999). Plaintiff utterly fails to do so here. The court thus concludes his allegations about final policymakers— and by extension those policymakers ratifying or directing subordinate misconduct—are conclusory.

Having determined that none of plaintiff's attempts to allege a *Monell* liability claim succeed, the court dismisses the *Monell* claim without prejudice. It fails to state a claim. Here, and throughout the rest of this Order, the court dismisses without prejudice those claims which fail to state a claim because of deficient pleading. *See Heisinger v. Vill. of Tularosa*, No. 22-cv-0366 KG/GBW, 2023 WL 2601262, at *3 (D.N.M. Mar. 22, 2023) ("Because dismissal is based

36

on the sufficiency of the pleading, the Court determines dismissal should be without prejudice."); *see also Martley v. Basehor*, No. 19-cv-02138-HLT-GEB, 2022 WL 292433, at *1 (D. Kan. Feb. 1, 2022) ("The claims were dismissed without prejudice because they were based on a pleading deficiency."); *Palmer v. City & County of Denver*, No. 18-CV-01003-REB-STV, 2019 WL 8223550, at *1 (D. Colo. Apr. 9, 2019) ("Because this is a pleading, as opposed to a legal deficiency, those claims will be dismissed without prejudice."), *aff'd*, 800 F. App'x 678 (10th Cir. 2020); *Guiden v. Werholtz*, No. 11-3031-SAC, 2011 WL 1807443, at *20 (D. Kan. May 11, 2011) ("Absent the requisite specificity in the complaint, dismissal without prejudice is necessary.").

The court moves next to claims against individual defendants. At the outset, the court reiterates the pleading standard for such claims. According to the Tenth Circuit, "complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008). In light of that complexity, "it is particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*[.]" *Id.* at 1250 (emphasis in original). Given the tendency of the 4AC to attribute conduct to groups of defendants, the court emphasizes this standard to set the table for its individual-claims analysis. This work begins with plaintiff's First Amendment retaliation claim.

## B.    First Amendment Retaliation (Count I)

Plaintiff alleges a First Amendment retaliation claim against six individual defendants—Wiehl, Owen, Padilla, Bailey, Zentner, and Presbrey. Doc. 129 at 59 (4AC).[5] He premises this

---

[5]    The city and county defendants suggest plaintiff asserts his retaliation claim against other defendants—such as Conaway. Doc. 137 at 9. But the 4AC lists just six defendants under plaintiff's retaliation claim. Doc. 129 at 59 (4AC). Plaintiff has had five chances to get his Complaint right. If he intended to include other defendants—as some of the allegations under his retaliation claim suggest—he

claim on the constitutionally protected activity of criticizing public officials, and local and city governance. He alleges, for instance, that he voiced criticism that "[l]ocal ordinances were not being enforced consistently" and provided a specific example of how Mayor Wiehl's residence allegedly violates local zoning ordinances. *Id.* at 8, 12–13 (4AC ¶¶ 37.a, 64–65). And plaintiff alleges that he expressed concerns to city and county law enforcement and the city council about Wiehl allegedly battering three separate women but—because Wiehl was the mayor—never experiencing any consequences. *Id.* at 8–9 (4AC ¶¶ 38–45).

As a city-council member, plaintiff highlighted issues with the city's spending of taxpayer money—noting suspicious auditing practices—and questioned the accuracy of meeting minutes and unbiased employee drug testing. *Id.* at 12 (4AC ¶ 61). In sum, plaintiff alleges he engaged in constitutionally protected speech about a litany of issues: "the city's misuse of funds, government corruption, Mayor Wiehl's domestic battery crimes, their cover-up, [and] other government waste, abuse, and corruption issues[.]" *Id.* at 59 (4AC ¶ 311). For this speech, defendants Wiehl, Owen, Padilla, Bailey Zentner, and Presbrey retaliated against him. And plaintiff contends the retaliation continued when he later "engaged in the constitutionally protected activity of seeking redress from the government by defending himself[.]" *Id.* at 59–60 (4AC ¶¶ 313–14).

A First Amendment retaliation claim requires the plaintiff to establish the following elements:

> (a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse

---

should have listed them. The court won't add those individuals now. Nor does plaintiff ask for this kind of relief. The court thus considers only the six defendants listed in the 4AC when it assesses plaintiff's retaliation claim.

> action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Van Deelen v. Johnson*, 497 F.3d 1151, 1155–56 (10th Cir. 2007). Our Circuit has referred to this standard as the "*Worrell* test." *Id.* at 1156 (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)).

Defendants argue that most of the allegations supporting plaintiff's retaliation claim involve conduct barred by the statute of limitations. Doc. 137 at 8; Doc. 138 at 2. And the alleged conduct occurring after May 5, 2021, defendants contend, lumps defendants together. Doc. 137 at 8. Finally, defendants assert, the timely allegations are factually unsupported and conclusory in a fashion that can't suffice to state a claim, and thus don't merit the court accepting them as true. *Id.* In arguing the allegations' sufficiency, defendants don't challenge whether they suffice to allege a constitutionally protected activity—the first prong of the *Worrell* test. Nor could they. *See McCook v. Springer Sch. Dist.*, 44 F. App'x 896, 904 (10th Cir. 2002) (acknowledging that "the First Amendment right to criticize public officials and to petition the Government for a redress of grievances are protected activities" (quotation cleaned up)). And defendants never mention the second *Worrell* prong of chilling effect. But defendants' arguments supporting two individual defendants invoke *Worrell*'s third prong—substantial motivation. Specifically, they contend that there's a disconnect between plaintiff's exercise of constitutionally protected conduct and the motivation of these two defendants. The court evaluates these arguments, below. But, before the court dives into the retaliation claim for each defendant, disposing of a few preliminary matters will prepare the way.

*First*, the court already has decided that plaintiff's First Amendment retaliation claim couldn't rely on time-barred conduct. *See* § III.C.5. The court thus considers only the timely allegations when assessing whether plaintiff has stated a retaliation claim against these five

defendants.  *Second*, it also disregards plaintiff's repeated allegations that a given defendant acted "with the knowledge and encouragement" or at the direction of a slew of other defendants. *See, e.g.*, Doc. 129 at 68 (4AC ¶ 316.gg) ("On June 9, 2021, with the knowledge and encouragement of Mayor Wiehl, Owen, Bailey, and Zentner, Padilla knowingly filed a frivolous Petition[.]")  The court determines such "knowledge and encouragement" or "at the direction of" allegations are conclusory.  *See Iqbal*, 556 U.S. at 680–81 (identifying allegations that defendants "knew of, condoned, and willfully and maliciously agreed" as "not entitled to the assumption of truth" because they are "bare assertions" that are "conclusory"); *Cannon v. PNC Bank, N.A.*, No. 2-15-cv-00131-BSJ, 2016 WL 9779290, at *7 (D. Utah Aug. 31, 2016) ("Conclusory statements regarding the PNC Defendants' 'knowledge' and 'participation' . . . are not sufficient.").  With these two caveats, the court assesses the allegations made against each defendant.  It starts with Assistant Attorney General Zentner.

### 1.    Zentner[6]

Excluding time-barred conduct, the 4AC alleges that Zentner filed criminal charges against plaintiff on May 5, 2021.  Doc. 129 at 68 (4AC ¶ 316.ee).  And it alleges that Zentner later filed "a frivolous motion to revoke Plaintiff's bond" and "another frivolous motion in the pending criminal proceedings seeking a finding of contempt[.]"  *Id.* at 68, 70 (4AC ¶ 316.gg, ll).  Then, the 4AC details various actions taken by Zentner during the criminal trial—making misrepresentations of fact, presenting false testimony, suppressing evidence, and disclosing only incriminating portions of text messages.  *Id.* at 70 (4AC ¶ 316.mm).  Finally, it claims that

---

[6]    Earlier in this Order, the court allowed plaintiff's retaliation claim against Zentner to survive its prosecutorial immunity analysis because the court identified investigative activities supporting the claim. *See* § III.A.2.b.  But that was before the court had concluded that a significant portion of the conduct alleged to support plaintiff's retaliation claim was time-barred.  This problem manifests the hazards of having to start somewhere.  With that time-barred conduct now excluded, all allegations of retaliatory acts by Zentner qualify for immunity—as the next section explains.

Zentner made untrue statements to the state court in a later motion hearing.  *Id.* at 71 (4AC ¶ 316.nn).

All of these allegations—filing charges, filing motions, and engaging in trial/motion hearings—involve activities "intimately associated with the judicial phase of the criminal process."  *Bledsoe*, 53 F.4th at 602 n.13.  Absolute prosecutorial immunity thus is available for these actions.  *Id.*  And so, the court dismisses plaintiff's First Amendment retaliation claim against Zentner with prejudice as barred by prosecutorial immunity.

### 2. Presbrey

The 4AC levels just one timely allegation against defendant Presbrey under its retaliation claim—he took plaintiff into custody on May 5, 2021, "knowingly" on "false charges," plaintiff alleges.  Doc. 129 at 68 (4AC ¶ 316.ff).  But the 4AC never alleges that Presbrey *himself* knew the charges were false.  Indeed, it suggests the opposite.  The 4AC alleges that Presbrey was assigned to the investigation because he "would do what [he was] told[.]"  *Id.* at 17 (4AC ¶ 85).  What's more, the 4AC alleges that Presbrey's fellow deputy confirmed that Presbrey was just following orders.  *Id.* (4AC ¶ 84).  These allegations implicate the third element of the *Worrell* test.  They suggest Presbrey was motivated by doing his job or avoiding trouble, not "as a response to the plaintiff's exercise of constitutionally protected conduct."  *Van Deelen*, 497 F.3d at 1155–56.

Indeed, plaintiff acknowledges in his Response that "Presbrey and Zentner may have had different motives than [the other defendants] for seeking to have Plaintiff falsely investigated and prosecuted with crimes[.]"  Doc. 143 at 13.  Yet plaintiff never plausibly alleges what that motive was for Presbrey specifically.  He just argues, generally, that "'*everyone*' . . . wanted [plaintiff] removed from office due to not liking his public criticism or him as a person."  *Id.* at

14 (emphasis added).  Likewise, when plaintiff proffers other conclusory allegations about defendants' retaliatory motive, he again alleges them with a whole group of defendants lumped together.  *See, e.g.*, *id.* at 20 ("[A]nyone with [that] knowledge . . . would have naturally had a significant incentive to silence Plaintiff, including Mayor Wiehl, Owen, Bailey, Presbrey, and Zentner." (quotation cleaned up)).  Such general and amorphous allegations of retaliatory motive don't suffice to state a claim, and for two reasons:  they're conclusory, and they're not individualized to defendant Presbrey.

The Tenth Circuit, in the summary-judgment context, has emphasized the need for individualized retaliatory motives.  *A.M. v. Holmes*, 830 F.3d 1123, 1163 (10th Cir. 2016) (affirming district court's grant of summary judgment to defendants and denial of summary judgment to plaintiff); *id.* ("[I]n cases where plaintiffs have presented enough individualized evidence of a substantial motive to retaliate to establish § 1983 liability for a First Amendment retaliation claim, we have emphasized that the evidence indicated that each individual defendant had such a substantial motive.").  For example, evidence that a defendant overheard the plaintiff's speech and admitted that the speech disturbed him qualifies as individualized evidence of a substantial motive.  *Howards v. McLaughlin*, 634 F.3d 1131 (10th Cir. 2011), *rev'd on other grounds sub nom. Reichle v. Howards*, 566 U.S. 658 (2012).  So, even if plaintiff alleges that some defendants acted for retaliatory reasons, that doesn't make it plausible that Presbrey did.  Indeed, in *Holmes*, the Circuit found insufficient the proffered motive evidence that relied on generalized knowledge about the underlying situation.  It held the "lack of particularized evidence is simply not sufficient to support liability under § 1983[.]"  *Id.* at 1164.

Applying that same reasoning here, but in the motion-to-dismiss context, plaintiff needn't supply evidence, obviously.  But he must allege some level of non-conclusory, individualized

42

motive. Taking plaintiff's allegations as true, the 4AC portrays Presbrey as an instrument employed by others to satisfy their own retaliatory motives, not as one who holds such motives himself. Nowhere in its 102 pages does the 4AC allege that Presbrey knew about plaintiff's First Amendment activity. Rather, Presbrey investigated plaintiff for crimes at the behest of the various conspirators. The court thus dismisses plaintiff's retaliation claim against Presbrey for failing to state a claim without prejudice. Plaintiff hasn't alleged plausibly the third prong of the *Worrell* test. Plaintiff's retaliation claim against Bailey suffers a similar fate, as the next section explains.

### 3. Bailey

The city and county defendants argue that plaintiff's alleged protected action logically doesn't supply a retaliatory motive for any of the sheriff defendants, which includes Undersheriff Bailey. Doc. 137 at 9. They contend that plaintiff's "alleged protected action all relates to his conduct at City Council meetings and speaking out against City practices." *Id.* And so, they explain, there's "no connective tissue with the Sheriff Defendants[.]" *Id.* Plaintiff never responds. *See* Doc. 143 at 34–35 (responding to defendants' arguments about government retaliation but never addressing the connective-tissue argument).

The court's conclusions about Presbrey's motive apply with equal force to Bailey. The 4AC implies that Bailey became involved in the alleged conspiracy to charge plaintiff with crimes and remove him from office because he was friends with City Attorney Owen. Doc. 129 at 16 (4AC ¶ 81). Owen allegedly "harbored significant animosity towards Plaintiff" because plaintiff had "a single consensual sexual encounter" with Owen's younger sister just after the sister graduated from high school. *Id.* at 5 (4AC ¶¶ 27–28). But none of those reasons—neither Owen's friendship nor her personal animosity—supply Bailey with a retaliatory motive

43

premised on activity protected by the First Amendment.  And, as with Presbrey, plaintiff's sweeping motive allegations just lump Bailey in with multiple defendants.  *See* Doc. 143 at 20 ("[A]nyone with [that] knowledge . . . would have naturally had a significant incentive to silence Plaintiff, including Mayor Wiehl, Owen, Bailey, Presbrey, and Zentner." (quotation cleaned up)).  Instead of providing "individualized [allegations] of a substantial motive," plaintiff invokes friendship, borrows personal animus, or pleads a conclusory motive of retaliation for a large group of defendants.  *Holmes*, 830 F.3d at 1163.  These kinds of motivation just won't suffice.  The court concludes plaintiff has failed to allege plausibly the third prong of the *Worrell* test for Bailey—providing only conclusory, non-individualized, or personal-friendship-based motives.  The court dismisses plaintiff's retaliation claim against defendant Bailey without prejudice.

### 4.      Padilla

The city and county defendants argue that plaintiff's retaliation claim against Padilla—Smith Center's Director of Economic Development—must fail because she wasn't a state actor during the relevant timeframe.  Doc. 137 at 8–9.  Defendants cite the 4AC in support, which discusses Padilla's decision to resign from her Economic Development position for Smith Center early in 2021.  *Id.* (citing Doc. 129 at 40–41 (4AC ¶¶ 210–16)).  Plaintiff responds that "Padilla does not need to be a state actor to be liable under a § 1983 conspiracy theory."  Doc. 143 at 35.  Plaintiff's response has two problems.

*First*, he conflates his § 1983 conspiracy claim with his § 1983 retaliation claim.  *Second*, he never attempts to establish that Padilla—during the timeframe relevant to his retaliation claim—engaged in state action.  That's a problem because it's elementary that a First Amendment retaliation claim requires state action.  *How v. City of Baxter Springs*, 217 F. App'x

44

787, 792 n.3 (10th Cir. 2007) ("[T]o determine whether [defendant] . . . may be held personally liable under § 1983, [the court] must determine whether her actions may 'be fairly attributed to the State.'" (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982))); *Sethunya v. Monson*, No. 12-cv-454 TS, 2013 WL 65471, at *3 (D. Utah Jan. 4, 2013) (holding plaintiff fails to state a claim where complaint "contains no allegations that her First Amendment rights were violated as a result of state action" because "only the government can violate First Amendment rights" so "every First Amendment claim thus requires state action in some sense" (quotation cleaned up)). Without pleading the requisite state action, the court concludes that plaintiff fails to state a claim for First Amendment retaliation against Padilla.

Defendants also argue that this state-action deficiency precludes all of plaintiff's discrete-action claims against Padilla. Doc. 150 at 6. So, they assert, the court should dismiss all claims against Padilla except the conspiracy claim on this "no-state-action" basis. *Id.* The court pauses its retaliation analysis to evaluate defendants' state-action argument.

The Supreme Court long has held that it's possible for a "nominally private person" to "engage[] in state action for the purposes of § 1983." *Lindke v. Freed*, 601 U.S. 187, 196 (2024). To provide an example, *Lindke* recited the holding of *Griffin v. Maryland*, 378 U.S. 130 (1964). There, *Lindke* explains, the Court held that a security guard at a privately owned amusement park had engaged in state action because he "had been 'deputized as a sheriff of Montgomery County' and possessed 'the same power and authority' as any other deputy sheriff." 601 U.S. at 195–96 (quoting *Griffin*, 378 U.S. at 132 & n.1). The Court then extrapolated a general principle to assess whether nominally private individuals acted on the state's behalf: Where the "State ha[s] . . . allowed its power to be exercised by someone in the private sector[,] . . . the source of the power, not the identity of the employer, control[s]." *Id.* at 196.

45

Applying this principle here, Padilla's decision to leave her government position before the relevant period doesn't end the state-action inquiry, at least not necessarily. A private person still can engage in state actions, as *Griffin* demonstrates. But nevertheless, the inquiry must end here. That's appropriate because plaintiff makes no attempt to show that Padilla—functioning as a private person during the statute-of-limitations period—engaged in state action. The 4AC itself acknowledges Padilla resigned as a government employee before the limitations period. Doc. 129 at 40 (4AC ¶¶ 206, 210) (alleging Padilla resigned in January 2021). And plaintiff never provides any allegation or argument to suggest that Padilla—while a private person—engaged in state action. So, the court dismisses without prejudice all discrete-action, § 1983 claims against Padilla for failure to state a claim. Now, jump back to plaintiff's retaliation claim.

### 5.    Wiehl and Owen

Finally, plaintiff also alleges a First Amendment retaliation claim against Mayor Wiehl and City Attorney Owen. This one's easy. When the court excludes conduct barred by the statute of limitations, plaintiff's retaliation claim doesn't include any non-conclusory allegations against Wiehl or Owen. *See* Doc. 129 at 68–71 (4AC ¶ 316.ee–rr). For Wiehl and Owen's alleged retaliation conduct within the statute-of-limitations, plaintiff just alleges these defendants "directed" or lent their "knowledge and encouragement" to various events—*i.e.*, the May 2021 criminal charges and Padilla's June 2021 frivolous petition for protection order. *See id.* As already stated, these "directed" and "knowledge and encouragement" allegations don't clear the *Iqbal* hurdle, leaving plaintiff with zero timely allegations of retaliation by these defendants. So, the court dismisses the retaliation claim against these defendants, as well. And that's the final nail in the coffin. The court dismisses plaintiff's retaliation claim, without prejudice, for failure

46

to state a claim.  Next, the court takes up two groups of claims—plaintiff's three malicious-prosecution claims and then plaintiff's three abuse-of-process claims.

### C.      Malicious Prosecution Claims (Counts III, V, IX)

The city and county defendants argue that plaintiff's malicious-prosecution claims under the Fourteenth Amendment's due-process clause are barred because state law already provides an adequate remedy.  Doc. 137 at 11.  Following his established pattern, plaintiff never responds to this argument.  *See* Doc. 143 at 29–34 (discussing malicious-prosecution claims but never addressing adequate-state-remedy argument); Doc. 150 at 6 (defendants identifying plaintiff's failure to respond and arguing that plaintiff "concedes, by not contesting, the point").  Perhaps plaintiff never responds because he realized, as explained below, that this claim is doomed.

The Fourteenth Amendment provides that no "state [shall] deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV, § 1.  "If a state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, then an adequate post-deprivation remedy—such as a state tort claim—will satisfy due process requirements."  *Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2013), *as amended on denial of reh'g*, (Jan. 8, 2014).  In *Myers*, plaintiff alleged that defendant had "conjured up facts to create the illusion of probable cause for an arrest warrant and subsequent prosecution."  *Id.* The Circuit held that defendant's alleged unlawful act "could not have been anticipated or prevented pre-deprivation[.]"  *Id.*  But, the Circuit concluded, state tort law already provided an adequate remedy because Colorado law supplies a claim for malicious prosecution.  *Id.*  And, the Circuit clarified, it was irrelevant whether that state tort claim was still available to plaintiff. *Id.* at 1193–94.  Even if the statute of limitations precluded plaintiff from recovering under that Colorado law, plaintiff once had a remedy—which satisfies due process.  *Id.* at 1194.

47

Apply *Myers* here. The unlawful conduct plaintiff alleges resembles the alleged conduct at issue in *Myers*. Specifically, he alleges the criminal prosecutions occurred without probable cause. Doc. 129 at 76, 81, 90 (4AC ¶¶ 337, 360, 415). And he alleges that defendants included materially false statements and omissions in the affidavits relied on by one of the prosecutions. *Id.* at 76–79 (4AC ¶¶ 339–41). Kansas law—like *Myers*'s Colorado law—provides a malicious-prosecution claim. *See Humes v. Cummings*, No. 18-2123-DDC-GEB, 2019 WL 1596579, at *5 (D. Kan. Apr. 15, 2019) ("[T]he Fourteenth Amendment does not provide a basis for relief because Kansas law provides an adequate remedy for malicious prosecution claims."); *Bergstrom v. Noah*, 974 P.2d 520, 526 (Kan. 1999) (identifying elements of Kansas malicious-prosecution claim). Given the complete absence of any argument by plaintiff to the contrary, the court infers plaintiff's malicious-prosecution claim relies on the Fourteenth Amendment. It thus is barred because an adequate remedy exists under state law. *See Myers*, 738 F.3d at 1193 ("The district court rightly rejected Myers' Fourteenth Amendment malicious-prosecution claim under 42 U.S.C. § 1983 because Colorado law provides an adequate remedy."). And the court dismisses the claims with prejudice. *See Boateng v. Metz*, 410 F. Supp. 3d 1180, 1193 (D. Colo. 2019) (dismissing malicious-prosecution claim because Colorado provided a post-deprivation, malicious-prosecution claim, so "no amount or degree of amendment could remedy this pleading deficiency").

### D.    Abuse of Process Claims (Counts IV, VI, and X)

Plaintiff brings three abuse-of-process claims. The defendants to each claim vary. He asserts all three against defendants Wiehl, Owen, Bailey, and Zentner. Doc. 129 at 80, 82, 91 (4AC). He includes Padilla in the first two abuse-of-process claims. *Id.* at 80, 82 (4AC). And he includes Presbrey in the first claim. *Id.* at 80 (4AC). The court already has determined that

48

Zentner is entitled to prosecutorial immunity for these abuse-of-process claims. *See* § III.A.2.b. It also dismissed these claims against Padilla because plaintiff has failed to demonstrate that she, as a non-state actor, had engaged in state action. *See* § IV.B.4. So, the court addresses these abuse-of-process claims only against defendants Wiehl, Owen, Bailey, and—for the first claim—Presbrey.

The first abuse-of-process claim centers on the criminal charges and subsequent prosecution of plaintiff arising on May 5, 2021. Doc. 129 at 80 (4AC). The second claim arises from Padilla's June 9, 2021, petition for a protection order, and Zentner's motion to revoke plaintiff's bond. *Id.* at 82 (4AC). And the third claim implicates the civil contempt proceedings instigated by Zentner on September 2, 2021. *Id.* at 91 (4AC). All three suffer fatal deficiencies.

To allege a plausible § 1983 claim for abuse of process, a plaintiff "must plead the common law elements of abuse of process as well as a constitutional violation." *Jackson v. Kan. Cnty. Ass'n Multiline Pool*, No. 03-4181-JAR, 2005 WL 756773, at *5 (D. Kan. Jan. 19, 2005) (citing *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996)). In Kansas, an abuse-of-process claim requires plaintiffs to allege

> (1) that the defendant made an illegal, improper, perverted use of the process, (a use neither warranted nor authorized by the process), and (2) that the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of process, and (3) that damage resulted to the plaintiff from the irregularity.

*Porter v. Stormont-Vail Hosp.*, 621 P.2d 411, 416 (Kan. 1980) (quotation cleaned up).

Defendants contend, *first*, that plaintiff's conclusory allegations fail to satisfy the requisite elements for all three abuse-of-process claims. Doc. 137 at 14. They home in on the second element, in particular, and describe as "conclusory" and "far-fetched" plaintiff's allegation that a desire to get plaintiff off the city council motivated any illegal, perverted, or improper use of process. *Id.* at 14–15. *Then*, defendants focus their arguments on each claim,

49

identifying deficiencies with the allegations relied on by each.  For the first claim based on the May 2021 prosecution, defendants contend that it relies on time-barred allegations.  *Id.* at 14.  For the second claim based on Padilla's June 2021 petition, defendants argue that any conduct it relies on (that's not conclusory) involves actions by Padilla.  *Id.* at 15.  And since Padilla isn't a state actor, it fails to state a claim.  *Id.*  For the third claim based on Zentner's 2021 civil contempt proceedings, defendants propound a similar argument—all the conduct it relies on is Zentner's conduct; Zentner's entitled to immunity and the allegations involving the other defendants are conclusory.

Plaintiff's Response amounts to a convoluted mass of facts combining eight total claims—for malicious prosecution, abuse of process, equal protection, and retaliatory prosecution—in one disorganized section.  Doc. 143 at 29–34.  It rambles on about facts that— presumably—connect to one of those eight claims, though the reader is left to fend for itself when trying to discern how it does so.  *Id.*  This form of response does nothing to offset the deficiencies defendants identified with each of the three abuse-of-process claims.  The court addresses those deficient claims, one-by-one, below.

### 1.      Abuse of Process (Count IV)

Plaintiff's first abuse-of-process claim relies on conduct defendants allegedly engaged in when preparing to file the May 5, 2021, criminal charges.  This reliance is apparent when plaintiff refers to conduct "described more particularly in the immediately preceding counts"— *i.e.*, actions taken leading up to the filing of criminal charges, not after it.  Doc. 129 at 80 (4AC ¶ 352).  Plaintiff's Response also reveals this reliance, citing frequently to conduct occurring before May 5, 2021, in the context of its abuse-of-process arguments.  *See* Doc. 143 at 32–33 (relying on Presbrey's preparation and signing of an affidavit on May 3, 2021; Presbrey

50

neglecting to secure plaintiff's statement before filing charges; Zentner's investigation starting on June 19, 2020; Owen providing legal advice on August 10, 2020). Relying on such conduct reveals fatal flaws in plaintiff's first abuse-of-process claim for two independently sufficient reasons.

*For starters*, this conduct is barred by the two-year statute of limitations, so plaintiff can't rely on it for one of his discrete-act claims. *See* § III.C.5; *see also Breitling v. LNV Corp.*, No. 15-CV-0703-B, 2015 WL 5896131, at *7 (N.D. Tex. Oct. 5, 2015) ("[I]nsofar as Plaintiffs' abuse of process claims are based on conduct occurring before August 29, 2012 (two years before the filing of this lawsuit), the statute of limitations bars those claims."). *More crucially*, relying on conduct before the filing of charges fundamentally misunderstands the abuse-of-process claim. The claim arises from conduct that occurs *after* charges ensue, not *before*. *McGregor v. City of Neodesha*, No. 22-1033-EFM, 2022 WL 6728149, at *7 (D. Kan. Oct. 11, 2022) ("[A]buse of process refers to the improper use of process *after* it has issued." (emphasis in original) (quotation cleaned up)); *Teets v. Bd. of Cnty. Comm'rs*, No. 02-4060-JAR, 2003 WL 1565936, at *7 (D. Kan. Mar. 24, 2003) ("An abuse of process claim can only occur after a proceeding is filed. Plaintiff has alleged no facts that suggest [defendant] had any involvement after the criminal complaint was filed."); *Stevens v. Sanpete County*, 640 F. Supp. 376, 385 (D. Utah 1986) ("Because abuse of process focuses on the misuse of process that has properly been set in motion, if abuse of process is to form the basis for Stevens's section 1983 claim the focus must be on the defendants' acts *after* Stevens was arrested and charged." (emphasis in original)), *aff'd*, 846 F.2d 76 (10th Cir. 1988). Thus, for these dual reasons, plaintiff's first abuse-of-process claim (Count IV) fails to state a claim. So, the court dismisses it without prejudice.

2.    **Abuse of Process (Count VI)**

51

Plaintiff's second abuse-of-process claim alleges specific actions by Padilla and Zentner. Doc. 129 at 82–83 (4AC ¶ 368) (alleging Padilla filed a frivolous Petition for Order of Protection); *id.* at 83 (4AC ¶ 369) (alleging Zentner filed a frivolous Motion to Revoke plaintiff's bond based on Padilla's petition). But when it comes to the other defendants named in this claim—Wiehl, Owen, and Bailey—this claim merely pleads conclusory allegations. For example, it alleges that Padillia filed her frivolous petition "with the knowledge and encouragement of Mayor Wiehl, Owen, Bailey, and Zentner[.]" *Id.* at 82 (4AC ¶ 368). But the court already deemed such knowledge-and-encouragement allegations conclusory. *See* § IV.B. And plaintiff alleges that Wiehl, Owen, and Bailey "caus[ed] the initiation" of Padilla's petition and Zentner's motion. Doc. 129 at 83 (4AC ¶ 370). But it offers no factual support for that alleged causation. What's more, it alleges no other involvement of Wiehl, Owen, and Bailey.

Recall that "it is incumbent upon a plaintiff to identify *specific* actions taken by *particular* defendants in order to make out a viable § 1983 . . . claim." *Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013) (emphasis in original) (quotation cleaned up). This claim fails to make out any specific actions by Wiehl, Owen, and Bailey—apart from the conclusory "knowledge-and-encouragement" or "caused-the-initiation" actions already discarded. So, the court concludes that the second abuse-of-process claim fails as conclusory as the claim applies to defendants Weihl, Owen, and Bailey.

This conclusion leaves Padilla and Zentner. But the court already has determined that Padilla wasn't a state actor at the time of these allegations, and dismissed all discrete § 1983 claims against her. *See* § IV.B.4. And the court determined that Zentner is entitled to prosecutorial immunity for actions such as filing motions. *See* § III.A.2.b. The court thus

52

dismisses this second abuse-of-process claim—and not only as it applies to these two defendants. Instead, the court dismisses this claim as applied to all defendants.

### 3.    Abuse of Process (Count X)

Plaintiff's final abuse-of-process claim suffers a similar malady.  Plaintiff premises the claim on the civil contempt proceedings initiated by Zentner in September 2021.  Doc. 129 at 91 (4AC); *id.* at 51 (4AC ¶ 272) (explaining that Zentner filed motion for civil contempt).  The other defendants implicated by this claim—Wiehl, Owen, and Bailey—are again looped in without any specific allegations about these individuals' particular actions.  That won't do.  *See Pahls*, 718 F.3d at 1226 (requiring "plaintiff to identify *specific* actions taken by *particular* defendants" to state "viable" claim (emphasis in original)).  And Zentner, again, is entitled to prosecutorial immunity.  *See* § III.A.2.b.  So, this claim falters, as well.

In sum, the court dismisses all three of plaintiff's abuse-of-process claims, without prejudice under Rule 12(b)(6), apart from those it already dismissed with prejudice on prosecutorial immunity grounds.

### E.    False Arrest (Count VII)

Plaintiff asserts a false-arrest claim against Wiehl, Owen, Padilla, Zentner, and Conaway. Doc. 129 at 84 (4AC).  Plaintiff alleges that Padilla, in June 2021, made a knowingly false report to Undersheriff Bailey.  *Id.* (4AC ¶ 378).  Padilla reported that she saw plaintiff drive by her home—thus violating a temporary order of protection Padilla had secured against plaintiff.  *Id.* Padilla also provided Bailey with photos of a truck driving by her house on the day of the alleged violation.  *Id.* at 48 (4AC ¶ 252).  Plaintiff alleges that Bailey knew that the truck in the photos wasn't plaintiff's truck.  *Id.*  Instead, the photos "were indecipherable photos of some truck that originated from Mayor Wiehl," plaintiff alleges.  *Id.* at 84 (4AC ¶ 381).  So, plaintiff asserts,

Bailey "knowingly committed perjury in swearing in his affidavit that the 'truck' was Plaintiff's truck." *Id.* at 48 (4AC ¶ 252). A judge signed the bottom of the affidavit—without issuing a warrant. *Id.* at 86 (4AC ¶ 388). And, on July 1, 2021, deputy Conaway arrested plaintiff allegedly "without probable cause." *Id.* (4AC ¶¶ 389–90). Plaintiff remained detained until July 9, 2021. *Id.* (4AC ¶ 391).

Defendants argue, *first*, that the allegations that involve defendants Wiehl and Owen are conclusory. Doc. 137 at 10. The court agrees and adds Zentner to the list. Plaintiff again employs knowledge-and-encouragement language to suggest that Wiehl, Owen, and Zentner participated in a "planned deprivation of liberty[.]" Doc. 129 at 84 (4AC ¶ 378). And he alleges that Owen and Zentner directed Bailey about how to prepare the false affidavit. *Id.* at 85 (4AC ¶ 384). But the court already has decided that such knowledge, encouragement, and direction allegations are conclusory. *See* § IV.B. So, the court concludes plaintiff fails to state a claim for false arrest against Wiehl, Owen, or Zentner.

That conclusion leaves Padilla, Bailey, and Conaway as the remaining defendants in this count. The court also already has decided that Padilla wasn't a state actor in June 2021, and plaintiff hasn't alleged that she—as a private person—engaged in state action. So, plaintiff fails to state a false-arrest claim against Padilla, as well. When it comes to Bailey and Conaway, however, the court must conduct a more fulsome false-arrest analysis for these two defendants, next.

"To prove a false arrest . . . the plaintiff must allege that the arresting officer acted without probable cause." *Howl v. Alvarado*, 783 F. App'x 815, 818 (10th Cir. 2019). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he

54

or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Id.* (quotation cleaned up).

Here, plaintiff alleges that there was no probable cause for his arrest. Doc. 129 at 85 (4AC ¶ 387). Defendants contend that Bailey relied on Padilla's allegations and the photographs she provided—with no reason to know they were false. Doc. 137 at 10–11. So, defendants argue, plaintiff's allegation that Bailey knowingly included false information in the affidavit is conclusory. *Id.* at 10. But even if it weren't, defendants argue, the affidavit still supports a finding of probable cause with all the allegedly false information removed. And they urge the court to consider the entirety of the affidavit (Doc. 86-4) and assess whether it still supports probable cause.[7] "Even excluding the photos or references to them," defendants contend, "the affidavit supports probable cause." Doc. 137 at 11. The court takes the bait.

---

[7]    We're at the motion-to-dismiss stage. So, two preliminary issues arise when undertaking this task—considering a document outside the pleadings and measuring probable cause at this early stage. Neither one prevents the court from proceeding.

*First*, a court generally shouldn't consider anything outside the pleadings when ruling on a 12(b)(6) motion. *Waller*, 932 F.3d at 1282. But the "district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.* (quotation cleaned up); *N.E.L. v. Gildner*, 780 F. App'x 567, 571 (10th Cir. 2019) (finding no abuse of discretion where "district court considered the outside documents after concluding there was no dispute as to their authenticity, plaintiffs had referred to them in the [complaint], and the facts in these documents were central to plaintiffs' claims."). Plaintiff never disputes the authenticity of the affidavit (Doc. 86-4). Just the opposite, he cites it himself. *See* Doc. 143 at 39. And plaintiff referred specifically to the affidavit in his 4AC. Doc. 129 at 84 (4AC ¶¶ 379–80). Plus, it's central to plaintiff's claim that Bailey instigated a false arrest because Bailey didn't have probable cause without the contested photographs. So, the court may consider the affidavit at the motion-to-dismiss stage.

*Second*, a court can measure the probable cause of an affidavit—even at the motion-to-dismiss stage. *See, e.g.*, *N.E.L.*, 780 F. App'x at 571–73 (affirming district court's motion-to-dismiss conclusion that misrepresentations and omissions in affidavit weren't material); *Houlin v. Forsey*, No. 24-cv-00293, 2025 WL 691373, at *10 n.128 (D. Utah Mar. 4, 2025) ("To the extent Mr. Houlin argues courts categorically cannot determine whether the affidavit would still support probable cause at the motion to dismiss stage, he is incorrect." (quotation cleaned up)).

55

The probable-cause affidavit relies on Padilla's report that plaintiff drove by her home. Doc. 86-4 at 1. Padilla's photos—and Bailey's statement endorsing them—supplement and support that report. *See id.* But even with the removal of the photos and Bailey's statement about them, Padilla's victim-witness statement suffices to support probable cause. "A police officer can base a probable cause determination upon a witness's statement." *Munday v. Johnson*, 257 F. App'x 126, 131 (10th Cir. 2007). "Moreover, 'the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness.'" *Id.* (quoting *Easton v. City of Boulder*, 776 F.2d 1441, 1449 (10th Cir. 1985)). "Absent special circumstances suggesting that a victim-witness is not credible, corroboration is not essential and a police officer should be permitted to assume he is dealing with a trustworthy person." *Id.* "In a § 1983 action, the burden is on the plaintiff to show that the witness's statement 'did not constitute reasonably trustworthy information sufficient to lead a prudent police officer to conclude that Plaintiff [committed an offense].'" *Id.* (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 & n.1 (10th Cir. 1995)).

Nothing in plaintiff's 4AC plausibly alleges special circumstances that would require Bailey to apply skepticism and careful scrutiny to Padilla's statement. Padilla had a temporary protective order in place, so law enforcement could treat her statement as one from an identified victim or an ordinary citizen—no special scrutiny necessary. To be sure, plaintiff could have pointed to the photos and argued that their allegedly apparent falsity undermined Padilla's credibility and thus made corroboration incumbent on Bailey. He didn't. But even if plaintiff had advanced that argument, the court would've rejected it. According to plaintiff's own allegations, the photos weren't of sufficient quality to put Bailey on notice that Padilla wasn't

56

credible. Plaintiff describes the photos as "indecipherable photos of some truck[.]" Doc. 129 at 84 (4AC ¶ 381). Taking plaintiff's allegations as true, the photos nevertheless weren't clear enough to warn Bailey not to trust Padilla's witness statement. And without some "special circumstances" to suggest that Padilla lacked credibility, the law permits Bailey "to assume he is dealing with a trustworthy person" and doesn't require him to corroborate Padilla's statement. *Munday*, 257 F. App'x at 131. So, the probable-cause affidavit—relying strictly on Padilla's victim-witness report with all references to the photos removed—still supports a finding of probable cause. Put differently, Padilla's statement created the requisite probable cause, and some blurry photos of a truck don't suffice to negate that probable cause. With probable cause intact, plaintiff fails to state a false-arrest claim against Bailey. The same result follows for Conaway, but for a different reason.

The 4AC alleges that Bailey—an undersheriff—ordered Conaway—a deputy—to arrest plaintiff. Doc. 129 at 48 (4AC ¶ 253). And it alleges that Conaway later admitted to plaintiff that he "had no idea why they arrested plaintiff and [Conaway] apologized, claiming [he was] 'just following orders.'" *Id.* (4AC ¶ 254). Indeed, when Conaway arrested plaintiff, plaintiff asked for an explanation but Conaway "could not explain what [protection] order or how it was violated." *Id.* (4AC ¶ 253). According to plaintiff's allegations, therefore, Conaway didn't know any details about plaintiff's arrest but simply relied on Bailey's orders. The Tenth Circuit has determined that "[o]fficers may rely on information furnished by other law enforcement officials . . . to develop probable cause for an arrest." *Albright v. Rodriguez*, 51 F.3d 1531, 1536 (10th Cir. 1995). Taking plaintiff's allegations as true, Conaway relied on Bailey for information and orders, and that reliance suffices for probable cause. With probable cause intact, plaintiff's allegations don't support a plausible false-arrest claim against Conaway

57

The court dismisses plaintiff's false-arrest claim without prejudice for failure to state a claim. On to the next claim—illegal search and seizure of plaintiff's second phone.

### F.   Illegal Seizure and Search of Plaintiff's Second Phone (Count VII)

Plaintiff brings this claim against Wiehl, Owen, Bailey, and Zentner. Doc. 129 at 86 (4AX). Plaintiff alleges that Bailey prepared an affidavit for seizing and searching plaintiff's second cell phone "based on knowingly false allegations[.]" *Id.* at 87 (4AC ¶ 395). He alleges that the affidavit "contained statements that were either deliberately false or made in reckless disregard of the truth, *i.e.*, that Plaintiff had committed the crimes of blackmail and intimidation of a witness." *Id.* (4AC ¶ 396). The affidavit, plaintiff alleges, "contained no details supporting these crimes whatsoever" and it omitted information that "would have vitiated any probable cause[.]" *Id.* (4AC ¶¶ 396–97). Plaintiff then points to one allegedly false statement in the affidavit and alleges that the state-court judge issued a search warrant based on that lone misrepresentation. *Id.* at 89 (4AC ¶ 408).

Defendants argue, first, that plaintiff's allegations involving defendants other than Bailey are conclusory. Doc. 137 at 15. Then, defendants contend that plaintiff's allegations against Bailey don't suffice plausibly to state a claim, instead just reciting—threadbare—the elements of an illegal seizure. *Id.* (citing *Iqbal*, 556 U.S. at 678). And they note that plaintiff only identifies one allegedly false statement. *Id.* Finally, defendants again ask the court to review the affidavit and determine that removing the allegedly false statement doesn't vitiate probable cause. *Id.* at 16. The court takes up each argument, in turn, below.

Start with the conclusory allegations. The court has repeated—likely ad nauseum, at this point—that knowledge, encouragement, and direction allegations are conclusory. *See* § IV.B. And it noted at the outset of the individual-claims section the requirement that "the complaint

make clear exactly *who* is alleged to have done *what* to *whom*[.]" *Robbins*, 519 F.3d at 1250 (emphasis in original). This claim, like so many that have come before it, suffers these same deficiencies by asserting illegal search and seizure against Wiehl, Owen, and Zentner. It alleges knowledge, encouragement, and direction by these defendants—but nothing else. *See* Doc. 129 at 87–89 (4AC ¶¶ 395, 400, 404, 407). Indeed, Bailey took the only actions plaintiff alleges; he filed the affidavit and searched plaintiff's phone. *See id.* (4AC ¶¶ 395, 396, 399, 409). The court thus dismisses this claim without prejudice against Wiehl, Owen, and Zentner for failure to state a claim. It addresses the claim against Bailey and the question of probable cause, next.

"[A]n officer . . . violate[s] a plaintiff's Fourth and Fourteenth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant, if the false statement [is] material to the finding of probable cause." *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991). "The law is well-settled: a constitutional violation exists only when an affidavit contains information that is deliberately false or in reckless disregard for the truth *and* the remaining material contains insufficient content to support a finding of probable cause." *Thorpe v. Ancell*, 367 F. App'x 914, 921 (10th Cir. 2010) (emphasis in original). Courts "measure probable cause by (1) removing any false information from the affidavit, (2) including any omitted material information, and then (3) inquiring whether the modified affidavit establishes probable cause for the warrant." *Patel v. Hall*, 849 F.3d 970, 982 (10th Cir. 2017).

Here, defendants ask the court to measure the probable cause of the August 2021 search warrant affidavit by removing the allegedly false information plaintiff identifies and then

59

assessing the modified affidavit.[8]  Doc. 137 at 16.  Plaintiff identifies just one false statement

from Bailey.  To understand this false statement, the court must take a brief detour.

Plaintiff had allied with Adam Rentschler, a city council member.  Doc. 129 at 10, 87

(4AC ¶¶ 48–50, 399).  Bailey had requested that Rentschler turn over his texts with plaintiff.

*Id.* at 87 (4AC ¶ 399).  From these texts, Bailey learned that plaintiff had secured footage of his

July 2021 arrest.  *Id.* at 88 (4AC ¶ 402).  Bailey, worried plaintiff would expose him, alleged in

the affidavit—falsely, claims plaintiff—that "Rentschler expressed his belief that Phelps was

sending the message to harass Rentschler."  *Id*. (4AC ¶ 403).  Rentschler also served as a

witness in plaintiff's criminal case.  *Id.* at 87 (4AC ¶ 401).  Detour over.

Plaintiff points to Bailey's one allegedly false statement as the basis on which the state-

court judge issued the search warrant.  *Id.* at 89 (4AC ¶ 408).  The 4AC also alleges Bailey

omitted information.  *Id.* at 87 (4AC ¶ 397).  What information Bailey omitted, no one knows;

plaintiff never substantiates that allegation with any facts.  *See id.* at 50–51 (4AC ¶¶ 264–73)

(alleging conduct related to illegal seizure and search claim but never identifying any omitted

information); *id.* at 86–89 (4AC ¶¶ 394–412) (same).  So, the court considers the allegation

about omitted information conclusory.  And it modifies the affidavit by removing the allegedly

false information about Rentschler's expressed belief.  The court concludes the remaining

affidavit content nevertheless supports a finding of probable cause.

---

[8]     The court already has concluded that this task is permissible at this stage of the litigation, given
the circumstances.  *See* n. 7.  Specifically, plaintiff's Response never disputes the authenticity of the
affidavit at issue.  On the contrary, he cites it himself.  *See* Doc. 143 at 43.  What's more, plaintiff
referred to the affidavit in his 4AC and the affidavit is central to plaintiff's claim that Bailey falsified it,
undermining a finding of probable cause.  Doc. 129 at 87 (4AC ¶¶ 395–96).  Thus, the court properly can
consider this affidavit (Doc. 86-5), as well.

Bailey's affidavit purports to provide a basis for a search warrant premised on blackmail and witness intimidation. Doc. 86-5 at 15–16 (Bailey Aff.). Three things stand out about this affidavit.

*First*, it explained that Rentschler was an endorsed witness for the prosecution in plaintiff's state criminal case. *Id.* at 14 (Bailey Aff.). It then attests that Rentschler showed Bailey texts sent by plaintiff to Rentschler. *Id.* Some of the texts were about plaintiff's state criminal case. *Id.* The affidavit quotes texts Rentschler sent in return, asking plaintiff to stop texting him. *Id.* For example, Rentschler wrote to plaintiff: "I'm a witness in your case. I'm not talking about this with you or anyone else. I will discuss it when my time to testify is Period." *Id.*

*Second*, the affidavit detailed some of the text messages plaintiff had sent to Rentschler. Here's a sampling:

- "I'm going to make you all look like fools"

- "Well you won't report an illegal executive session because you are on the fire department . . . Don't worry we will report it for you"

- "It[']s not your enemies that get you in trouble, it[']s your friends. Uncover the truth or the feds will. I'm on a mission to expose the corruption in the town"

*Id.* at 14–15 (Bailey Aff.). And the affidavit explained that plaintiff sent Rentschler body-camera video associated with the state criminal case. *Id.* at 15 (Bailey Aff.).

*Last*, in the affidavit's closing, Bailey attested that he believed plaintiff was "trying to pressure Rentschler to stop siding with the prosecution by threatening to publicly blame him for some crime or other embarrassing story[.]" *Id.* He then provided the Kansas statute defining blackmail. *Id.* This definition includes "threat[en]ing to communicate accusations or statements

61

about any person that would subject such person or any person to public ridicule, contempt or degradation." *Id.* (quoting Kan. Stat. Ann. § 21-5428(a)(1)). Bailey also attested that he believed plaintiff was "trying to intimidate witnesses such as Rentschler" by sending those witnesses "body cam video to discourage them from cooperating with the prosecution." *Id.* Bailey then noted that plaintiff also had sent the body-cam video to another individual associated with the prosecution. *Id.* And he suggested a search of plaintiff's phone would help identify any other witnesses plaintiff had contacted. Finally, Bailey included the Kansas statute defining witness intimidation. That statute provides, in part, "attempting to prevent or dissuade, with an intent to vex, annoy, harm, or injure . . . [a]ny witness . . . from attending or giving testimony at any civil or criminal trial[.]" *Id.* at 16 (Bailey Aff.) (quoting Kan. Stat. Ann. § 21-5909(a)).

Given Rentschler's status as a witness, plaintiff's texts to him, and the governing law, the court concludes the affidavit supports a finding of probable cause—even with the allegedly false sentence removed. Plaintiff's texts suggesting he will make Rentschler look like a fool; will report an allegedly illegal executive session; and will get the feds involved. These suggestions all implicate possible public ridicule, contempt, or degradation, as provided in the blackmail statute. Kan. Stat. Ann. § 21-5428. And plaintiff's persistent attempts to contact Rentschler about plaintiff's criminal case—despite Rentschler's protests—align with the witness-intimidation statute's "intent to vex or annoy" language. Kan. Stat. Ann. § 21-5909(a). In light of the other attested facts, removing the allegedly false statement that "Rentschler expressed his belief that [plaintiff] was sending the message to harass Rentschler" is of little consequence. Indeed, a victim's subjective belief that the relevant party intends to harass the victim isn't an element of blackmail. *See State v. McFarland*, 549 P.3d 414, 2024 WL 2555729, at *4 (Kan. Ct. App. May 24, 2024) (describing elements of blackmail). Nor is it an element of witness

62

intimidation.  *See State v. Kemp*, 494 P.3d 305, 2021 WL 4128227, at *3 (Kan. Ct. App. Sept. 10, 2021) (describing elements of witness intimidation).

This conclusion kneecaps the constitutional violation underpinning plaintiff's illegal seizure and search claim.  Recall that "a constitutional violation exists only when . . . the remaining material contains insufficient content to support a finding of probable cause."  *Thorpe*, 367 F. App'x at 921.  Here, it's just the opposite.  Removing the allegedly offending material has little—perhaps even no—effect on establishing probable cause.  So, the court dismisses plaintiff's illegal-seizure-and-search claim (Count VIII) against Bailey, as well.  In sum, no illegal-search claim survives.  On to the next two claims.

## G.     Equal Protection (Count XI) & Retaliatory Prosecutions (Count XII)

The court addresses these claims together because they both suffer the same fatal flaw— collective and imprecise pleading.  Plaintiff asserts an equal-protection, class-of-one claim against Wiehl, Owen, Bailey, Zentner, Presbrey, Conaway, and Holt.  Doc. 129 at 91 (4AC). The court has determined already that Zentner and Holt are entitled to absolute immunity for this claim—prosecutorial and judicial immunity, that is, respectively.  Plaintiff also asserts a retaliatory-prosecution claim against Wiehl, Owen, Padilla, Bailey, Presbrey, and Zentner.  *Id.* at 92 (4AC).  The court has determined already that Zentner is entitled to prosecutorial immunity and plaintiff never alleges state action on Padilla's part.

The claims also fail for the other listed defendants because neither claim ever identifies a single individual action taken by any particular defendant.  All the equal-protection paragraphs list multiple defendants, or level allegations against no defendant at all.  *Id.* (4AC ¶¶ 426– 28).  The retaliatory-prosecution paragraphs list at least five defendants or, alternatively, refer collectively to "[t]hese defendants[.]"  *Id.* at 92–93 (4AC ¶¶ 433–35, 439–40).  By blaming

everyone and no one, plaintiff thus "fails to isolate the allegedly unconstitutional acts of each defendant[.]" *Robbins*, 519 F.3d at 1250. And such imprecise pleading is fatal to individual-capacity claims under § 1983. It fails to provide adequate notice and it fails to state a plausible claim. *See id.* ("Given the complaint's use of either the collective term "Defendants" or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed."); *id.* at 1251 ("In general, state actors may only be held liable under § 1983 for their own acts, not the acts of third parties."). The court thus dismisses plaintiff's equal-protection and retaliatory-prosecution claims against all defendants without prejudice because they're pleaded deficiently. The analysis fun continues with plaintiff's procedural-due-process claim, next.

### H.      Procedural Due Process at Trial (Count XIV)

Plaintiff alleges a procedural-due-process claim against Wiehl, Owen, Padilla, Bailey, Presbrey, and Zentner premised on their alleged behavior at plaintiff's criminal trial. Doc. 129 at 95 (4AC). Most of these allegations appear to center on witness testimony. Some allege impropriety with trial evidence. The court starts with the witness testimony.

Plaintiff alleges that defendants violated his due-process rights when they "made knowing misrepresentations to the jury, committed perjury, [or] encouraged perjury." *Id.* (4AC ¶ 451). He then specifically identifies just two defendants' conduct at trial: Wiehl and Zentner's. But Zentner is entitled to absolute prosecutorial immunity for his trial conduct. This leaves Wiehl's testimony.

Plaintiff alleges Wiehl "knowingly falsely testified" about three topics. *Id.* (4AC ¶ 451.a–c). These allegations, too, are unavailing. Here's why. "Witnesses, including public

officials and private citizens, are entitled to absolute testimonial immunity from civil suits for damages based upon their testimony.  And when absolute testimonial immunity attaches, it bars *all* claims based on the witness's testimony—even if it is perjurious." *Berryman v. Niceta*, 143 F.4th 1134, 1143 (10th Cir. 2025) (emphasis in original) (quotation cleaned up).  "Generally, the types of judicial proceedings protected by absolute immunity are those in which a witness is subject to compulsory process, takes an oath, responds to questions on direct examination and cross-examination, and may be prosecuted subsequently for perjury." *Id.* (quotation cleaned up).

Applying witness immunity, combined with Zentner's prosecutorial immunity, wipes out almost all of plaintiff's procedural-due-process claim.  Only two allegations survive—both center on evidence handling pre-trial.  Plaintiff alleges that Zentner, Presbrey, and Bailey "deleted crucial text messages from Plaintiff's first cell phone" and "suppressed and/or destroyed evidence of" an interview with one of Mayor Wiehl's alleged victims.  Doc. 129 at 26, 96 (4AC ¶¶ 131, 451.f, g).  The collective pleading denounced so often in this Order would suffice—yet again—to dismiss any claim premised on these allegations.  But even if it weren't sufficient to decide the trial-based due-process claim, these allegations are time-barred.  The sheriff's deputies executed the search warrant and seized plaintiff's phone on July 1, 2020.  *Id.* at 30 (4AC ¶ 156).  And the alleged victim's interview occurred on June 25, 2020.  *Id.* at 28 (4AC ¶ 142).  The court already has concluded that any discrete-act claim premised on conduct before May 5, 2021, was time-barred.  So, whether the court points to collective pleading or the statute of limitations, plaintiff's procedural-due-process claim is subject to dismissal.

### I.     Failure to Intervene (Count XV)

Plaintiff originally alleged a failure-to-intervene claim against nine defendants.  Doc. 129 at 96 (4AC).  But plaintiff's Response expressly abandons this claim against all defendants

except Conaway. Doc. 143 at 48. So, the court evaluates merely whether plaintiff has stated a failure-to-intervene claim only against Conaway.

"The Tenth Circuit has recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Bledsoe*, 53 F.4th at 616 (quotation cleaned up). A failure-to-intervene plaintiff must allege plausibly three elements: "1) a government officer violated his constitutional rights, 2) a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and 3) the defendant had a realistic opportunity to intervene, but failed to do so." *Id.* The key to defendants' argument against this claim here is the second element—requiring a *different* government actor.

Recall that Conaway, a deputy sheriff, arrested plaintiff in July 2021 but later admitted had no idea why he'd arrested plaintiff and he was just following orders. Doc. 129 at 48 (4AC ¶ 253). Defendants contend that plaintiff fails to state a claim against Conaway because plaintiff alleges that Conaway himself arrested plaintiff. Doc. 150 at 7. And that fact makes Conaway the government official in the first element—who violated constitutional rights—not the *different* government actor in the second element. Defendants are right. The 4AC alleges that Conaway made the allegedly offending arrest. Here's the relevant 4AC language: "In Conaway's case, he knew he should not have arrested Plaintiff on July 1, 2021, and that to do so was a constitutional violation, but he did so anyway." Doc. 129 at 97 (4AC ¶ 459).

Plaintiff's Response contends that Conaway witnessed another deputy, Dowling, forcibly arresting plaintiff on July 1, 2021. Doc. 143 at 48. For support, plaintiff directs the court to three paragraphs in the 4AC, paragraphs 454–56. *Id.* Predictably—given the persistent imprecision manifested in plaintiff's briefing—those paragraphs don't allege anything about

66

Conaway. *See* Doc. 129 at 96 (4AC ¶¶ 454–56) (discussing plaintiff's alleged injuries from seizure of his second cell phone and incorporating above paragraphs by reference for plaintiff's failure-to-intervene claim).

The elements of a failure-to-train claim make it clear:  the defendant must've observed the constitutional violation by "a different government actor[.]" *Bledsoe*, 53 F.4th at 616.  And here, the 4AC alleges that Conaway made the allegedly offending arrest.  Doc. 129 at 97 (4AC ¶ 459) ("In Conaway's case, he knew he should not have arrested Plaintiff on July 1, 2021 . . . but *he did so anyway*." (emphasis added)).  The right result seems pretty straightforward—the law doesn't require Conaway to intervene against himself.  But since there's some discrepancy between plaintiff's 4AC and his Response, the court also considers the final element of a failure-to-train claim, as well.

Plaintiff's only attempt to satisfy the third failure-to-intervene element goes like this: "These defendants always had a realistic opportunity to intervene but failed to do so." *Id.* at 97 (4AC ¶ 462).  That's it.  Such a "threadbare" recitation of an element doesn't plausibly state a claim.  *Iqbal*, 556 U.S. at 678.  So, even if plaintiff had alleged that Conaway merely observed the arrest—thus satisfying the second element—his claim still fails on element three as conclusory.  The court thus dismisses plaintiff's failure-to-intervene claim against Conaway as insufficiently pleaded to state a plausible claim.  Two claims remain:  IIED under Kansas common law (Count XVI) and plaintiff's two theories of civil conspiracy (Count XVII).

## J.    IIED (Count XVI)

Plaintiff alleges that Wiehl, Owen, Padilla, Bailey, Presbrey, Zentner, and Holt, intentionally or recklessly, inflicted emotional distress on him, violating Kansas common law. Doc. 129 at 97 (4AC).  For starters, plaintiff's IIED claims against all defendants except Holt

67

falter under the now-familiar deficiency of "fail[ing] to isolate the allegedly unconstitutional acts of each defendant[.]" *Robbins*, 519 F.3d at 1250. Plaintiff either lists all defendants (except Holt) together as a group or collectively refers to them as "[t]hese defendants." *See* Doc. 129 at 98 (4AC ¶¶ 465, 467). The court already explained why that won't pass muster. *See* § IV.G. Plaintiff makes no attempt, for example, to identify what conduct by which defendant, qualifies as "extreme and outrageous." Instead, he simply recites the element. *See* Doc. 129 at 98 (4AC ¶ 467) ("These defendants' conduct was extreme and outrageous and committed either to intentionally cause Plaintiff severe and extreme emotional distress or in reckless disregard concerning whether Plaintiff experienced such emotional distress or not."). That's just not enough in this modern era of federal court pleading.

Where plaintiff doesn't pinpoint which one of each defendants' actions implicate his IIED claim, it hamstrings the court's ability to evaluate that claim. More than 450 paragraphs precede plaintiff's IIED claim. *See* Doc. 129 at 2–97 (4AC ¶¶ 1–463). Does plaintiff propose that the court comb through this haystack of allegations to find the needle that—might—satisfy his IIED claim? And does he expect the court to do so for six distinct defendants? That's plaintiff's job, not the court's. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."), *United States v. Griebel*, 312 F. App'x 93, 97 (10th Cir. 2008) (same); *see also Adler v. Wal-Mart Stores*, 144 F.3d 664, 672 (10th Cir. 1998) ("[W]e, *like the district courts*, have a limited and neutral role in the adversarial process, and are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it." (emphasis added)).

On his IIED claim, the only defendant for whom plaintiff alleges independent conduct is Holt. Doc. 129 at 98 (4AC ¶ 466). Plaintiff alleges that Holt's mishandling of his expungement

caused him severe emotional distress because the false charges of sex crimes remained available to the public. *Id.* The court already has decided that Holt is entitled to quasi-judicial immunity. *See* § III.A.2.a. Plaintiff contends that this immunity doesn't extend to ministerial acts under Kansas law. Doc. 143 at 50 (citing *Cook v. City of Topeka*, 654 P.2d 953 (Kan. 1982)). Even if Holt weren't entitled to immunity, this claim still would fail. Plaintiff alleges that Holt sent a certified copy of plaintiff's expungement to the SCSD, instead of the proper recipient—the KBI. Doc. 129 at 56 (4AC ¶¶ 291–94). That's the sole act which plaintiff invokes when asserting his IIED claim against Holt. *Id.* at 98 (4AC ¶ 466). But even taking plaintiff's allegations as true, that act doesn't satisfy one of the threshold elements of an IIED claim under Kansas law.

Under Kansas law, extreme-emotional-distress claims have two threshold requirements "which must be met and which the court must, in the first instance, determine[.]" *Valadez v. Emmis Commc'ns*, 229 P.3d 389, 394 (Kan. 2010). Most important for the court's work here, the court must assess first whether "the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery[.]" *Id.* In expounding on the first threshold requirement, the Kansas Supreme court explained that "to provide a sufficient basis for an action to recover for emotional distress, conduct must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Id.*

Sending paperwork to the wrong recipient at one's job hardly "goes beyond the bounds of decency" and it's not "utterly intolerable in a civilized society." *Id.* "Kansas has set a very high standard for the common law tort of intentional infliction of emotional distress." *Hollis v. Aerotek, Inc*, No. 14-2494-SAC, 2015 WL 773313, at *5 (D. Kan. Feb. 24, 2015). And behavior so routine and pedestrian as mis-directing paperwork doesn't cut it. *See Ellibee v. Biggs*, 251 P.3d 113, 2011 WL 1878153, at *3 (Kan. Ct. App. May 6, 2011) (holding that quoting a Kansas

69

Supreme Court opinion doesn't qualify as extreme and outrageous conduct because "[p]eople quote Supreme Court opinions countless times each week"). To hold otherwise would mean that a significant portion of the workforce would incur IIED liability at some point in their working life. So, even if quasi-judicial immunity didn't apply, the court would dismiss plaintiff's IIED claim against Holt for failure to state a claim. *See Hollis*, 2015 WL 773313, at *6 ("Courts routinely dismiss claims of outrage on a Rule 12 motion when . . . the alleged conduct is not extreme and outrageous under state law."). At long last, the court reaches plaintiff's final claim—civil conspiracy.

### K.    Civil Conspiracy (Count XVII)

Plaintiff's last cause of action asserts a conspiracy claim under two distinct legal mechanisms: 42 U.S.C. § 1983 and Kansas common law. Doc. 129 at 98–99 (4AC ¶¶ 470–76). He levels the claim at Wiehl, Owen, Padilla, Bailey, Presbrey, and Zentner. *Id.* His theory of the alleged conspiracy, best the court can tell, rests on a First Amendment violation. He alleges that the conspiracy's "primary purpose was to silence Plaintiff in violation of his First Amendment Rights[.]" Doc. 129 at 99 (4AC ¶ 472). And he explains at the outset of his Complaint that the various alleged actions by defendants were "all in retaliation for and to silence his complaints[.]" *Id.* at 2 (4AC ¶ 3). The court thus previously interpreted plaintiff's conspiracy claim as alleging "a multi-year plot in retaliation for his complaints about government abuse, waste, and corruption." *Phelps v. Kansas*, No. 23-2206-DDC-RES, 2025 WL 743975, at *1 (D. Kan. Mar. 7, 2025).

The city and county defendants try to frame the conspiracy differently. They argue that the "conspiratorial objective was to have Plaintiff recalled" as a city councilman. Doc. 150 at 4. Then, they argue, seeking plaintiff's "removal from a public office by holding a recall election is

70

not unlawful or unconstitutional." *Id.* And so, they say, defendants' alleged conspiracy lacks the requisite unconstitutional goal. *Id.* But this approach to the conspiracy claim defines the conspiratorial goal narrowly—in terms of just recall—when the 4AC alleges broader First Amendment violations. The court thus rejects defendants' framing of the claims and, instead, evaluates plaintiff's conspiracy claim as premised on First Amendment retaliation.

Having defined broadly the contours of plaintiff's conspiracy allegations, the court evaluates whether plaintiff states a claim under either legal mechanism, starting with § 1983.

### 1.    § 1983 Conspiracy

A § 1983 conspiracy deprives "a plaintiff of a constitutional or federally protected right under color of state law." *Bledsoe*, 53 F.4th at 609 (quotation cleaned up). This kind of conspiracy claim requires plaintiffs to "allege specific facts showing an agreement and concerted action amongst the defendants." *Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021) (quotation cleaned up). "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." *Id.* (quotation cleaned up). The Tenth Circuit elaborated on the requisite elements to allege a conspiracy in *Snell v. Tunnell*:

> The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences.

920 F.2d 673, 702 (10th Cir. 1990) (quotation cleaned up).

Defendants advance three categories of arguments for dismissing plaintiff's § 1983 conspiracy claim. *First*, they invoke the statute of limitations, contending that the only conduct that can support plaintiff's conspiracy claim is that which occurred after May 5, 2021. Doc. 137 at 6–7; Doc. 138 at 18. But—again—the court already has determined that the continuing-

violation doctrine permits plaintiff to rely on untimely conduct for his conspiracy claims. *See* § III.C.1. So, this argument is unavailing. *Second*, defendants argue that the conspiracy allegations are vague, conclusory, implausible, and insufficient. Doc. 137 at 7; Doc. 138 at 18. *Finally*, they contend, the allegations point only to lawful conduct, but a conspiracy agreement must be illegal. Doc. 137 at 7; Doc. 138 at 18. The court just addressed this lawful conduct argument, finding plaintiff premises his conspiracy theory on First Amendment violations, not simply getting plaintiff recalled. Stating the obvious, violating the First Amendment is unlawful. So, the court focuses its analysis on defendants' second bundle of arguments—those challenging the sufficiency of plaintiff's allegations to state a claim. Readers who have made it this far likely know how this will turn out.

The court agrees with defendants that the 4AC's allegations of a conspiratorial agreement are strictly conclusory. *See, e.g.*, Doc. 129 at 14 (4AC ¶ 72) ("To be sure, they privately reached an agreement to act in concert for the common purpose of getting Plaintiff removed from his duly elected position either by force or resignation."). The 4AC alleges boatloads of specific facts, but it never alleges "specific facts showing an agreement[.]" *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998). That is, plaintiff hasn't alleged plausibly that defendants *reached an agreement* to retaliate against plaintiff for his protected activity of criticizing public officials and local governance.

Because "'direct evidence of an agreement to join a conspiracy is rare, a defendant's assent can be inferred from acts furthering the conspiracy's purpose.'" *Bledsoe*, 53 F.4th at 609 (quotation cleaned up) (quoting *United States v. Edmonson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). And an express agreement isn't essential. *Id.* But at the same time, parallel conduct alone can't suffice to support a plausible inference of conspiracy. *See Frasier*, 992 F.3d at

1025 ("[P]roof that defendants engaged in parallel action does not necessarily indicate an agreement to act in concert." (quotation cleaned up)). And here, plaintiff doesn't offer anything more than conclusory allegations and parallel action.

In his Response, plaintiff labors at some length trying to support his allegations of a conspiratorial agreement. He offers five enumerated reasons—followed by "several other facts"—from which he contends one can infer an agreement. Doc. 143 at 9–12. He focuses these five arguments on the inner circle of alleged conspirators: Wiehl, Padilla, Owen, and Bailey. *Id.* Then, he argues, Owen and Bailey expanded the conspiracy to include Presbrey and Zentner. *Id.* at 12–19. But plaintiff's inner-circle allegations don't suffice to "nudge [plaintiff's] claims across the line from conceivable to plausible." *Robbins*, 519 F.3d at 1247 (quotation cleaned up). And if that inner-circle agreement doesn't float, neither can the expanded-circle agreement.

The court reviews plaintiff's five enumerated reasons to infer an agreement among the inner circle of defendants and, then, his "several other facts" section. None suffice to allege plausibly an agreement between defendants.

The first four enumerated reasons plaintiff presents focus on an alleged history of unsavory cooperation between the inner-circle conspirators. *First*, plaintiff argues that "Mayor Wiehl historically enjoyed the protection of Owen and Bailey, the number one and number three law enforcement officials in the county[.]" Doc. 143 at 9. *Second*, he contends that "even in cases she allegedly recuses herself from, it was well known in the community that Owen never truly 'recuses' herself from matters involving Mayor Wiehl[.]" *Id.* at 10. *Third*, plaintiff asserts that "Owen and Bailey, according to a former SCSD deputy, had a history of working together to manipulate investigations, testimony, and other evidence to achieve their goals." *Id.* *Fourth*, he

73

focuses on the social relationship between Owen and Wiehl, and their positions within the city: "Owen and Mayor Wiehl frequently socialize together, Mayor Wiehl has unchecked control over economic development matters in the city, and Owen has owed her job as city attorney to Mayor Wiehl for the last decade." *Id.* These reasons fall far short of alleging the requisite "specific facts showing an agreement[.]" *Tonkovich*, 159 F.3d at 533. Instead, they are based on supposition and rumor, invoking broad theories of power dynamics. They do not allege facts specific to plaintiff, or even to the timeframe of the conspiracy plaintiff alleges. They are, in the end, no more than rumor-mill-generated, conclusory allegations of generalized, overarching, Hatfield-and-McCoy style feud. They are in the nature of a "bare assertion that certain officials 'conspired[.]'" *Gowadia v. Stearns*, 596 F. App'x 667, 671 (10th Cir. 2014). And that "is exactly the kind of conclusory statement [that courts] are not to consider when assessing a motion to dismiss." *Id.*

The fifth reason, though from a different genre, fares no better. Plaintiff argues that "as County Attorney since 2013 and statutorily responsible for approving recall petitions, Owen would have known and provided advice to Wiehl that the only way Plaintiff could be removed from office was through the recall process." Doc. 143 at 10. This reason improves upon the other four only in that it connects to plaintiff specifically. That's a start. But it's still conclusory. It relies largely on Owen's position within government and spins up a theory from there—*i.e.*, because Owen approves recall petitions, she must have told Wiehl about the recall process. There's no reason to assume that Wiehl couldn't have looked up for himself—or discovered from a plethora of other sources—the statutory requirements of removal from office. Presumably, as mayor, he would have access to resources to secure such information. And there's always the internet. Conducting a simple Google search—a now ubiquitous approach to

74

garnering information—would do the trick.  *See, e.g.*, *Recall of Local Elected Officials*, Kansas Legislative Research Department, https://klrd.gov/2024/12/18/recall-of-local-elected-officials/ (last visited Mar. 29, 2026) (outlining grounds and procedure for recall of local officials in Kansas).  None of plaintiff's five reasons to infer an agreement suffice to plausibly allege a meeting of the inner-circle's minds.

Nor can plaintiff's "[s]everal other facts" rescue his conspiracy allegations.  Doc. 143 at 11.  He cites four events "occurring from May to June 2020" that "provide additional evidence of the conspiracy."  *Id.*  At least these facts are specific.  And they occurred during the relevant timeframe.  But they still don't toe the line.  Plaintiff points to:

- Padilla, Wiehl, and Owen "all acting uncharacteristically cordial[ly] towards Plaintiff the entire month of May 2020[;]"

- "Mayor Wiehl intentionally leaving Padilla off the city council agenda for the June 8, 2020, meeting . . . only for her to ambush Plaintiff with prepared public remarks falsely accusing Plaintiff[;]" and

- "Owen, Mayor Wiehl, and Padilla immediately walking across the street after the June 8, 2020, city council meeting to have a private meeting" allegedly "to further discuss the" conspiracy.

*Id.*[9]  But small-town folk treating one another cordially doesn't suggest a plausible conspiracy.  And the court can't attribute conspiratorial motive to Padilla making public remarks to plaintiff—a city council member—at a meeting.  Citizens are allowed to speak—harshly, even—to their government.  Nor does simply meeting together reasonably invite such an inference.  *See Tonkovich*, 159 F.3d at 533 ("We do not think it is reasonable to infer, for example, that because

---

[9]    Plaintiff includes one other "fact" to support the alleged conspiracy:  "the City Clerk inexplicably sending an email to a [Anastasia Willits] on June 11, 2020, suggesting a 'formal complaint' had been made to the SCSD concerning Plaintiff's 'actions *that began back in April* and continue to escalate[.]'" Doc. 143 at 11 (emphasis in original).  The court doesn't include this in the list of "facts" above because neither the City Clerk nor Ms. Willits are defendants.  Email exchange between two non-defendants doesn't lend credence to plaintiff's allegations of an agreement between defendants.

certain Law School faculty members met with certain administrators during the investigation, they were conspiring with one another[.]"").  Plaintiff's facts are no more than smoke and mirrors. They require one to first assume a conspiracy and then filter lawful, even humdrum conduct through that assumption.  Plaintiff's supposed evidence of the conspiracy is equally (or more) consistent with the actions of people who live, work, and socialize together in a small town.  *See Gowadia*, 596 F. App'x at 672 (allegations that were equally or more likely explained by officers' legitimate purpose did not raise an inference of conspiracy).

The court thus concludes that plaintiff fails to allege a plausible § 1983 conspiracy because his allegations of a conspiratorial agreement are conclusory.  This determination also precludes a state-law conspiracy claim.

### 2. Common Law Conspiracy

Under Kansas law, an "actionable civil conspiracy occurs when the following elements are proved:  '(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.'"  *Hefner v. Deutscher*, 525 P.3d 1173, 2023 WL 2618765 at *16 (Kan. Ct. App. Mar. 24, 2023) (quoting *State ex rel. Mays v. Ridenhour*, 811 P.2d 1220, 1226 (Kan. 1991)).  "Because direct evidence is rarely available, a civil conspiracy may be proved by circumstantial evidence." *Vetter v. Morgan*, 913 P.2d 1200, 1206 (Kan. Ct. App. 1995).  So "plaintiffs need not show an express agreement" to demonstrate a meeting of the minds, but "they must show specific facts which support the inference of an agreement."  *In re Motor Fuel Temperature Sales Pracs. Litig.*, No. 07-1840, 2012 WL 976039, at *8 (D. Kan. Mar. 22, 2012).

As already suggested, Kansas common-law conspiracy also requires "specific facts which support the inference of an agreement."  *Id.*  And the court just concluded that plaintiff hasn't

76

alleged specific facts to support such an inference.  The court thus dismisses plaintiff's common-law conspiracy claim without prejudice under Rule 12(b)(6), as well.

### L.    Individual Claims' Conclusion

Thus ends the long and winding journey necessitated by plaintiff's 18 individual claims. The court has dismissed all claims without prejudice for failure to state a claim, except for the malicious-prosecution claims and those claims dismissed with prejudice on immunity grounds. With all claims dismissed, the court needn't engage in a qualified-immunity analysis.  Instead, it supplies explicit conclusions, below, to ensure it dismisses each claim against each defendant properly.

### V.    Conclusion

The court grants the city and county defendants' Motions to Dismiss (Doc. 136) and the state defendants' Motion to Dismiss (Doc. 138).  The court thus dismisses all claims and all defendants from the case.  Most are dismissed without prejudice.  The court clarifies the exceptions, below.

The court dismisses the following defendants or claims with prejudice:

- Cathi Holt:  all individual-capacity claims are dismissed with prejudice under quasi-judicial immunity;

- Adam Zentner:  the following individual-capacity claims are dismissed with prejudice under prosecutorial immunity—retaliation (Count I), malicious prosecution (Counts III, V & IX), abuse of process (Counts IV, VI, & X), equal protection (Count XI), retaliatory prosecution (Count XII), and violation of procedural due process at trial (Count XIV);

- Smith County Sheriff's Department:  all claims are dismissed with prejudice because this department isn't an entity subject to suit under § 1983;

- First Amendment retaliation claim (Count I) is dismissed to the extent it relies on acts before May 5, 2021, with prejudice as barred by the statute of limitations;

- Illegal search-and-seizure from July 1, 2020 claim (Count II), is dismissed with prejudice as barred by the statute of limitations;

- Procedural Due Process claim (Count XIII) is dismissed with prejudice as barred by the statute of limitations; and

- Malicious Prosecution claims (Counts III, V, IX) are dismissed with prejudice because no amendment could remedy the claims' pleading deficiencies.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Chris Bailey, Travis Conaway, Bruce Lehman, Tabitha Owen, Hope Padilla, Jeremy Presbrey, City of Smith Center, Kansas, Smith County Sheriff's Department, Smith County, Kansas, and Bryce Wiehl's Motion to Dismiss (Doc. 136) is granted.

**IT IS FURTHER ORDERED THAT** defendants Cathi R. Holt, State of Kansas, Bryson Potter, and Adam Y. Zentner's Motion to Dismiss (Doc. 138) is granted.

The court directs the Clerk of the Court to close this case.

**IT IS SO ORDERED.**

**Dated this 30th day of March, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**